|125 ˙ 95|
|163 437|

STEPHEN A. HALL *et al.*

*v.*

MARION O. HALL *et al.*

*Filed at Ottawa May 9, 1888.*

1. SPECIFIC PERFORMANCE—*of a contract adjusting differences among devisees, in disregard of a will.* An agreement between the widow and heirs of a deceased person, to set aside the will of the decedent, giving one of the heirs the greater part of his estate, and by such agreement prevent a resort to proceedings to contest the will, and whereby each of the heirs and the widow bind themselves to pay a ratable share of the indebtedness of one of the heirs to another, and thus avoid litigation, is such an agreement as a court of equity will look upon favorably, and readily interpose for its specific performance, unless there be some insuperable bar to prevent.

2. SAME—*and herein, whether the contract is complete in itself—and as to matters resting in parol.* After the death of a testator, leaving the larger part of his estate to one of his several heirs, by a will executed under such circumstances as to make it doubtful whether it would stand a contest, and for the purpose of avoiding threatened litigation, the heirs and widow executed an agreement in writing, whereby they jointly and severally agreed to settle the demand of one of their number on another heir, by each bearing his or her proportional part, and to set aside the will and settle the estate as in case of intestacy: *Held,* that such written agreement was of itself a complete contract, and was obligatory on all, notwithstanding it may have been understood at the time of its execution that a more formal instrument should thereafter be executed. The fact that it may have been agreed that one of the heirs was to have the home farm at an appraisal, being a matter distinct from the subjects of the agreement, would not render the same incomplete.

3. In such case, one of the heirs can not defeat the specific performance of such agreement on the ground that the written agreement was accompanied with a parol agreement as to what particular land he was to have at its appraised value, when each of the others consent that he shall have such land, and offer to convey that part to him in accordance with the parol contract claimed by him.

4. Although the court may not decree the specific performance of a contract with a variation from the contract, it is competent for the defendant to set up a parol variation from the written contract, and it will depend upon the particular circumstances of each case whether that is to defeat the plaintiff's right to specific performance, or whether the court will direct the performance of the contract, taking care that the subject

matter of the parol agreement or understanding is also carried into effect, so that all parties may have the benefit of what they contracted for.

5. SAME—*protecting dower interest.* Where a person dies after having made an agreement for the equal division of the lands and property of an estate, the fact that his widow is entited to dower in his share of the estate, is no obstacle to a decree for the specific performance of the contract against his heirs. In such case the decree of conveyance may be made subject to her right of dower.

APPEAL from the Circuit Court of Kane county; the Hon. CHARLES KELLUM, Judge, presiding.

This was a bill in chancery, for the specific performance of an alleged agreement, brought by Stephen A. Hall, Fitzena A. Summers and Matilda H. Plummer, children and heirs-at-law of Ophelia B. Hall, the widow of Alexis Hall, deceased, against Marion O. Hall and others, the widow and children and heirs-at-law of Eugene A. Hall, deceased.

On December 7, 1881, Alexis Hall made his will, by which he gave the greater share of his estate to his son Eugene A. At that time Alexis Hall was upward of eighty years of age, one side was paralyzed, and he had become so enfeebled by age and disease that he could not go about without help, and his memory was much impaired. In November following, his children signed a paper, of which the following is a copy:

"STATE OF ILLINOIS, }
  *DeKalb County.* }         *November . . . ., 1882.*

"We, each and all of us, whose names are hereto affixed, do solemnly agree to urge and insist upon a just, fair, impartial and equal distribution of all moneys, credits and property, both real estate and personal, of our father, Alexis Hall, between the four surviving children, whenever the proper time for such distribution shall come.

(Signed)               STEPHEN A. HALL,
                           EUGENE A. HALL,
                           FITZENA A. SUMMERS,
                           MATILDA H. PLUMMER."

Alexis Hall died January 15, 1883. On January 19 after, there was a meeting of the widow and children of the deceased at his former homestead, as a result of which the paper of which the following is a copy was drawn up and signed by the widow and all the children of the deceased:

"BIG ROCK, *Jan. 19, 1883.*

"We, jointly and severally, agree to settle the demands of Eugene Hall on Matilda H. Plummer and husband, by hereby agreeing to each bear our proportional part, or each bear one-fifth of $3427.08. And we furthermore agree to set aside the will of Alexis Hall, our father, and insist on a settlement of the estate of said Alexis Hall according to the laws of the State of Illinois for such cases made and provided.

(Signed.) STEPHEN A. HALL,
FITZENA A. SUMMERS,
MATILDA H. PLUMMER,
EUGENE A. HALL,
OPHELIA B. HALL."

As explanatory of this, it appears that on March 29, 1873, S. R. Plummer, (husband of Matilda H.,) John Andrews, and Matilda H. Plummer, gave their note of that date, for $2300, to Eugene A. Hall, due in ten months after date, with interest at ten per cent per annum, upon which a large amount remained due in January, 1883; that Plummer had assigned certain notes and judgments to Eugene A., as collateral security, and that the latter had failed to realize the amount due on these collaterals, as it was claimed, through his own negligence. It is this agreement of January 19, 1883, of which the bill seeks specific performance.

It is averred in the bill, and the evidence tends to show, that the parties intended to have a more formal instrument drawn up thereafter, which should express their agreement more fully, and that Hopkins & Aldrich were to prepare such a paper. Mr. Aldrich did prepare more formal papers, and on

7—125 ILL.

February 10, 1883, he went to the Hall homestead and met all the parties except Mrs. Summers, who was detained at home in Aurora. On that day those papers bearing that date were signed by all of the parties except Mrs. Summers, and were left in Aldrich's hands, as he says, as special custodian, to be held until an agreement was executed between Eugene Hall and Mrs. Summers, for conveyance by her to Eugene of a one-fourth interest in the Alexis Hall farm, and when that was drawn and executed by Eugene, he was to take it, with two other writings, to Mrs. Summers, and she was to sign them.

On February 22, 1883, Eugene A. Hall died. It was some time after his death that the papers left with Aldrich for Mrs. Summers to sign were executed by her, but the land contract between her and Eugene Hall was never written out, and so not signed by either party. The widow of Eugene, Marion O. Hall, was appointed administratrix of his estate, and guardian of the minor children, and she repudiated the entire contract between her husband and the other children, and claimed that the Alexis Hall estate was a part of the Eugene A. Hall estate. On March 16, 1883, Stephen A. Hall, for himself and the other complainants, tendered to Marion O. Hall, as such administratrix, the four-fifths part of the Plummer indebtedness, and demanded the surrender of the $2300 Plummer note. She refused both to receive the money and to give up the note. Thereupon the present bill was filed, March 26, 1883. The court below, on final hearing, upon proofs taken, dismissed the bill, and the complainants took this appeal.

Messrs. SHERWOOD & JONES, and Mr. J. W. RANSTEAD, for the appellants:

If there was a controversy between the children, either commenced or threatened, over the validity of the will, and if this contract was entered into in good faith by the contesting parties, then a settlement of the controversy was a good and sufficient consideration for the contract, whether the will was in

fact valid or not. *McKinley* v. *Watkins*, 13 Ill. 143; *Cassell* v. *Ross*, 33 id. 244; *Pool* v. *Docker*, 92 id. 501.

The promise to pay the debt of Mrs. Plummer was also a sufficient consideration. *Buchanan* v. *International Bank*, 78 Ill. 500; *Doyle* v. *Knapp*, 3 Scam. 337.

The parties are bound by this agreement, although they meant to have a more formal writing drawn. *Foule* v. *Freeman*, 9 Ves. 351; *Thomas* v. *Deering*, 1 Keen, (15 Eng. Ch.) 729; *Chinnock* v. *Marchioness of Ely*, 4 DeG., J. & S. 638; *Pratt* v. *Railroad Co.* 21 N. Y. 305; *Blaney* v. *Hoke*, 14 Ohio St. 292; *Wharton* v. *Stoutenburg*, 35 N. J. Eq. 266; *Vermont Street M. E. Church* v. *Brose*, 104 Ill. 212.

The dower right is no defense to the enforcement of the contract against the heirs. *Mathison* v. *Wilson*, 87 Ill. 52; *Litsey* v. *Whittemore*, 111 id. 267; *Mestaer* v. *Gillipsie*, 11 Ves. 640; Waterman on Specific Per. sec. 104.

The contract belongs to that class which is favored in equity. *Parsons* v. *Ely*, 45 Ill. 232; *Kershaw* v. *Kershaw*, 102 id. 312; Fry on Specific Per. sec. 1505.

Mr. A. J. HOPKINS, Mr. N. J. ALDRICH, Mr. F. H. THATCHER, and Mr. CHARLES WHEATON, for the appellees:

Equity will not enforce a transaction which is incomplete, especially in the case of a voluntary contract. *Badgley* v. *Votrain*, 68 Ill. 25; *Wadhams* v. *Gay*, 73 id. 417; *Clarke* v. *Lott*, 11 id. 115.

An omission in a written agreement, whether it happened by mistake or fraud, or otherwise, may be proved by parol, and will be grounds for refusing a specific performance of the contract. *Jones* v. *Stathan*, 3 Adk. 388; *Ramsbottom* v. *Gosden*, 1 Ves. & B. 168; *Winch* v. *Winchester*, id. 378; *Brooks* v. *Wheeler*, 11 Pick. 439; *Best* v. *Stowe*, 2 Sandf. Ch. 298.

Unless the court is satisfied that the contract embodies the real intent of the parties, specific performance will be denied. *Pendleton* v. *Dalton*, Phillip's Eq. (N. E.) 119; *Morganthan* v.

*White,* 1 Sweeney, (N. Y.) 395; *Chambers* v. *Livermore,* 15 Mich. 381; *Railroad Co.* v. *Winter,* 1 C. & P. 57.

Mr. CHIEF JUSTICE SHELDON delivered the opinion of the Court:

The defence set up in this case is, that the contract of January 19, 1883, was not a complete contract, and that not being complete, it is as no contract, and so, that that alleged agreement can not be specifically enforced; that the only complete contract there could have been in the case would have been that of February 10, 1883, had the papers of that date all been executed and delivered, but as they were not, the attempted contract of February 10 was not completed, and hence there is no contract whatever to be specifically performed.

It would seem from the evidence, that the will of Alexis Hall, made on December 7, 1881, had come to the knowledge of his children, and had created a family dissatisfaction, from its giving to Eugene the larger part of the estate, and its being executed under the circumstances it was, and that threats had been made by the other children that they would contest the will. To reconcile this family difference the writing of November, 1882, appears to have been made and signed by all the children, whereby they agreed that there should be an equal distribution of their father's estate between his four surviving children, when the time for such distribution should come. It seems that another cause of difficulty had sprung up between Eugene and his sister Matilda and her husband, from a long standing note for $2300, which had been given by the two latter to Eugene, and was unpaid, and for which the latter had taken collateral securities, which had failed to be collected, from the negligence of Eugene, as was contended. This additional difficulty was amicably composed by these brothers and sisters by their all generously sharing equally among them and the widow the burden of this Plummer indebtedness, and

soon after the death of Alexis Hall they came together and executed this second agreement of January 19, 1883. By this agreement all the four children and the widow agree to settle the demands of Eugene on Matilda Plummer and her husband by each bearing one-fifth part of the Plummer indebtedness, and they renew their former agreement of November previous, to set aside the will of Alexis Hall, and that there should be a distribution of his estate as intestate estate. This agreement is signed by the widow, who did not sign the November agreement. This is an agreement of a most praiseworthy kind,— an amicable arrangement amongst brothers and sisters of difficulties between them, which would doubtless have been carried out to the entire satisfaction of them all but for the sudden death of Eugene. It is an agreement which a court of equity will look upon favorably, and readily interpose for its specific performance, unless there be some insuperable bar to prevent.

The written agreement of January 19 is plain, clear and full. It bears upon its face evidence of ample consideration, and is of itself a complete contract. That this would be an obligatory contract, although it was understood at the time that there should thereafter be a more formal instrument drawn up and executed to express the parties' agreement, is abundantly established by the authorities. (*Fowle* v. *Freeman,* 9 Ves. 351; *Chinnock* v. *Marchioness of Ely,* 4 DeG. J. & S. 638, (69 Eng. Ch.); *Pratt* v. *H. R. Co.* 21 N. Y. 305; *Wharton* v. *Stoutenburgh,* 35 N. J. Eq. 266.) All there is that can be urged against the completeness of this written contract of January 19, is that it omits to state one alleged term of the contract which was then made, viz., that Eugene was to have the home farm at an appraisal to be fixed by appraisers. This is an independent matter, separate and distinct from the two subjects of agreement named in the writing,—the Plummer indebtedness and the setting aside of the will. The bill does not ask to have performed a contract resting partly in a writing and partly in parol. It does not depend upon or seek anything whatever

respecting the alleged parol part of the contract, but it is the defendants who are placing reliance upon this parol part of the contract, setting it up in defence, and in defeat of the performance of the contract in writing. If the defendants would not have the enjoyment of the parol part of the contract, and so not have the benefit of what they contracted for, there would be some equity in such a defence. The heirs of Eugene allege against the performance of this written contract, that he was to have the home farm, and that this is not expressed in the writing. But if he does get the home farm, and the other children convey their interest in it to him or his heirs, there would seem to be no equity in such a defence of the mere omission of the writing to say that Eugene was to have the home farm at a price to be fixed by appraisers. And just such is the case presented here. Two of the children, Stephen A. and Matilda Plummer, have executed agreements for conveyance to Eugene of their interest in the home farm. The other of the three children, Mrs. Summers, is ready and willing, and offers by the bill, to make a like agreement for conveyance of her interest in the home farm,—so that the defendants do or will, under the offer of the bill, get the entire benefit of the parol part of the contract. There is no equity, then, in the defence which is set up, that this parol part of the contract was not expressed in the writing of January 19, and we think the authorities establish that such a defence is not sustainable where the defendant gets secured to him all the benefit of the parol portion of the contract.

In *London and Birmingham Railway Co.* v. *Winter*, 1 Craig & Phill. 57, (18 Eng. Ch.) a bill by the company for the specific performance of a written contract for the purchase of real estate, where there had been a subsequent parol agreement that the company should also pay for timber on the land, and for certain expenses, performance was decreed subject to the parol variation, and Lord Chancellor COTTENHAM said: "This is not a case within the meaning of those decisions in which

the court has said that it will not specifically perform the contract with a variation. If the court finds a written contract has been entered into, and the plaintiff says, 'That was agreed upon, but then there were certain other terms added, or certain variations made,' the court holds that in such a case the contract is not in the writing, but in the terms which are verbally stated to have been the agreement between the parties, and therefore refuses specifically to perform such an agreement. On the other hand, it is quite competent for the defendant to set up a variation from the written contract, and it will depend upon the particular circumstances of each case whether that is to defeat the plaintiff's title to have a specific performance, or whether the court will perform the contract, taking care that the subject matter of this parol agreement or understanding is also carried into effect, so that all parties may have the benefit of what they contracted for." And see *Robinson* v. *Page*, 3 Russ. 114, (3 Eng. Ch.); *Price* v. *Dyer*, 17 Ves. 357.

In 3 Parsons on Contracts, (5th ed.) 389, the author says: "It is a principle of equity jurisprudence that parol evidence is admissible to rebut, but not to raise an equity; and this principle or rule gives rise here to an important distinction. Although to resist a specific performance a defendant may show by parol that the written document does not fully represent the contract between the parties, and thus defeat the bill or compel the plaintiff to accept a performance with a variation, yet a plaintiff can not have a decree for a specific performance of a written contract with a variation upon parol evidence."

In *Park* v. *Johnson*, 4 Allen, 259, after a review of the English cases upon the subject, the court say: "The weight of authority seems clearly with the plaintiff on this point, (of having specific performance where ready to take the written agreement and fully to perform the omitted stipulation,) and while the court would refuse to give their aid in compelling

the literal execution of a written contract which does not con-
tain the whole agreement, they allow the objection to operate
no farther than to require the party seeking the aid of the court
to modify the written contract so as to embrace all the stipu-
lations that are alleged to have been omitted or subsequently
varied."

When Mr. Aldrich met the parties, on February 10, he
brought with him five papers, namely, (1) the agreement be-
tween the four children to set aside the will; (2) an agreement
between the widow and children to settle the Plummer indebt-
edness; (3) a renunciation of the will by the widow; (4) an
agreement between Stephen A. Hall and Eugene A. Hall for
a conveyance by the former to the latter of an undivided one-
fourth of the Alexis Hall farm; (5) a like agreement between
Mrs. Plummer and Eugene A. for conveyance of a like undi-
vided fourth. The first three were on that day executed by all
the parties there present, and delivered to Mr. Aldrich,—Mrs.
Summers being the only party absent. The first three papers
contained essentially nothing more than the agreement of Jan-
uary 19, amplified by legal verbiage, and the signing of them
by Mrs. Summers was of no moment, as she had signed the
19th of January agreement. The other two agreements for con-
veyances by Stephen A. and Mrs. Plummer were also signed
by them, respectively, on February 10. A like agreement for a
conveyance by Mrs. Summers, who was absent, was thereafter
to be executed by her, which she has ever been ready and will-
ing, and offers by the bill, to execute. Whatever of incom-
pleteness there may be in these papers of February 10, or any
one of them, has no bearing, as we conceive, upon the present
bill. It does not call in aid that transaction, and in no way
depends upon it. The bill is rested wholly upon the agreement
of January 19, 1883, and asks the specific performance of that
agreement. As the specific performance is only asked subject
to the defendants having all the benefit of the alleged parol
part of the agreement which is claimed to have been made,

we are of opinion the complainants are entitled to have the agreement of January 19, 1883, specifically performed.

It is claimed that the defendant Marion O. Hall has a dower interest in the land. Whether that be so or not is no objection to a decree of specific performance against the heirs of Eugene A. Hall. Any decree of conveyance might be made subject to whatever right of dower, if any, which Marion O. Hall may have in the land.

The decree will be reversed, and the cause remanded for further proceedings in conformity with this opinion.

*Decree reversed.*