OLLIE MOULD, Appellant, *vs.* ARTHUR W. ROHM *et al.* Appellees.

*Opinion filed October 24, 1916.*

1. SPECIFIC PERFORMANCE—*what complainant must show.* One who seeks specific performance has the burden not only of establishing the execution of the contract and full performance on his part, but also of showing that the agreement is full and complete, certain, fair and just in all its parts and provisions.

2. SAME—*when a court of equity will scrupulously weigh the evidence.* Where the contract sought to be specifically enforced requires the making of a different disposition of property than that which the law prescribes, a court of equity will scrupulously weigh the evidence and require clear proof of the existence and execution of the contract.

3. SAME—*rule where contract is claimed to have been in writing but is lost.* Where it is claimed that the contract sought to be specifically enforced was in writing but is lost or destroyed and it is attempted to prove the contract by parol evidence, the existence and terms of the contract must be established with the same certainty as though the contract rested entirely in parol.

4. SAME—*what does not establish a contract.* A contract to adopt the complainant and to leave her the adoptors' property is not established where the only evidence thereof is the testimony of two persons who claim to have seen the written contract under circumstances which render their testimony very improbable and whose testimony as to what the contract contained is uncertain, and where no person who would be interested in the contract is shown to have known of its existence.

FARMER, J., dissenting.

APPEAL from the Circuit Court of St. Clair county; the Hon. THOMAS M. JETT, Judge, presiding.

BARTHEL, FARMER & KLINGEL, and SCHAEFER & KRUGER, for appellant.

D. J. SULLIVAN, for appellees Arthur W. Rohm and William L. Rohm.

Mr. CHIEF JUSTICE CRAIG delivered the opinion of the court:

Appellant, Ollie Mould, filed her bill in chancery in the circuit court of St. Clair county against Arthur W. Rohm, William L. Rohm, the Southern Illinois Trust Company, (administrator of the estate of Louisa Rohm, deceased,) and others, for the specific performance of an alleged contract for her adoption by Louisa Rohm (formerly Louisa Strecker) and her husband, Christ F. Strecker, by which they had agreed to adopt her as their own child and provide for her as such, and for partition of the real estate of which Louisa Rohm died seized and possessed.

This is the second suit between the parties involving the real estate in question. At the April term, 1911, of the circuit court of St. Clair county the appellant filed a bill in chancery against appellees, Arthur W. Rohm and William L. Rohm, and others, for the purpose of having an alleged contract between her and Louisa Rohm, deceased, dated January 2, 1899, decreed a deed and for partition of the land therein described. An answer was filed to the bill and a replication to the answer, and on the issue thus formed a hearing was had in the circuit court and a decree entered in favor of appellant. The defendants to the bill prosecuted an appeal from the decree to this court, where the decree was reversed and the cause remanded, with directions to dismiss the bill. The case is reported under the title of *Mould* v. *Rohm,* 257 Ill. 436. Thereafter the cause was re-docketed in the lower court and a decree entered dismissing the bill for want of equity, pursuant to the mandate of this court. Thereafter appellant filed her bill in this case at the April term, 1913, of that court for a specific

performance of the instrument originally relied upon as constituting a deed from Mrs. Rohm to her, being the same contract which is set forth in the opinion in *Mould* v. *Rohm, supra.* Appellees filed a plea of *res judicata* to this bill, but before any hearing was had upon such issue appellant obtained leave to file an amended bill, in which she set forth a new contract alleged to have been made by Mrs. Rohm and her former husband, Dr. Strecker, for her adoption, and prayed specific peformance of such alleged contract and for partition of the premises of which Mrs. Rohm died seized and possessed. The contract relied upon in the amended bill is as follows:

"It is agreed between Dr. Christ F. Strecker, his wife, Louisa Strecker, and John Meyer, of East St. Louis, Illinois, that in consideration of John Meyer giving them the custody, control and services of his daughter, Ollie Meyer, from now on, forever, as their own child, the said Dr. Strecker and wife agree to adopt John Meyer's daughter, Ollie, as their own child, and to provide for her as such and to change her name to theirs and to will her their property at their death.

DR. CHRIST F. STRECKER,  (Seal)
LOUISA STRECKER,          (Seal)
JOHN MEYER.               (Seal)"

The answer filed by appellees denied the making of said alleged contract or that the same was one for the adoption of appellant. After replications were filed to the answer the cause was referred to the master in chancery to take and report the proofs, together with his conclusions as to the law and facts. The master made his report, finding that appellant had failed to prove the making and execution of the contract relied upon and recommending that a decree be entered in favor of appellees dismissing the bill for want of equity. Objections were filed to the master's report and findings, which were overruled and due exceptions preserved to the same in the circuit court. On the hearing in that court the exceptions were overruled and a decree entered approving and confirming the master's report and dismissing the bill for want of equity. From that decree appellant has prosecuted her appeal to this court.

The appellant was born on December 31, 1880. Her father's name was John Meyer, a former city treasurer of East St. Louis. Her mother died at East St. Louis in 1885. On April 15, 1888, her father became involved in some difficulties growing out of his office as city treasurer of East St. Louis and suddenly disappeared, leaving his family, consisting of three children, including the appellant, with their grandmother and a housekeeper. He never returned and has never been heard from since leaving East St. Louis. Within about two weeks after he left, such arrangements were made by the grandmother that Ida, the oldest child, was taken by relatives living at Lebanon, Illinois; Laura, the next oldest, by a family by the name of Becker, of St. Louis, Missouri; and appellant was taken to the home of Dr. and Mrs. Strecker, of East St. Louis. There is no evidence of any legal adoption of appellant ever having been made by Dr. Strecker and his wife. Dr. Strecker died on November 26, 1894, leaving a last will and testament, by which he gave all of his property to his wife, Louisa Strecker. In April, 1899, Mrs. Strecker, was married to appellee William L. Rohm. One child, Arthur W. Rohm, was born to them on September 14, 1902. After appellant was received in the home of Dr. Strecker and wife she adopted the name of Ollie Strecker, and was treated by them with the greatest kindness and consideration, and was frequently spoken of by them as their adopted daughter and was treated in every way by them as their child. She continued to live with them until the death of Dr. Strecker, and thereafter lived with Mrs. Strecker (or Mrs. Rohm) and husband until the marriage of appellant to Fred Nester, which occurred in 1907. This marriage did not prove a happy one, and she shortly thereafter obtained a divorce from her husband and returned to live with Mrs. Rohm. In 1909 she married Thomas R. Mould.

The evidence as to the making of the contract and its terms and provisions rests entirely upon the testimony of

two detectives who were employed by appellant and Mrs. Rohm to investigate the character of Nester at the time of the contemplated divorce proceedings against him, in 1907. The substance of the testimony of these detectives is, that in June, 1907, they were employed to investigate the character of Fred Nester, then the husband of the appellant. Charles L. Stradley, one of the detectives, testified that he called upon Mrs. Rohm at her home in East St. Louis and told her what his rates were, and received from her an advance payment to start work on the case, together with a description of Nester and where he could be found; that he placed one Dooley on the job; that a few days thereafter Mrs. Rohm called him up and said she wanted to see the man who had done the work, and he and Dooley went to her house and explained to her the work that had been done; that she then told them that Ollie was not her own daughter; that her father had disappeared after giving Ollie to them; that she had taken her into her home and raised her and looked after her as one of her own children; that she then showed him a piece of paper, and he read it and passed it to Dooley, who also read it, and that while reading it she went back into another room and got another paper which was much larger and showed it to him; that he just glanced at the latter paper and handed it to Dooley, who read it; that the smaller piece of paper stated that Dr. Strecker and his wife were to take the daughter of Meyer; that they were to provide for her as their own child, and in consideration of John Meyer giving them the daughter they were to adopt her and change her name to theirs and at their death leave her their property. He further testified that he had not seen Mrs. Mould from some time in 1908 or 1909 until in 1913, when she came to his home and he told her about this paper that had been shown to him by Mrs. Rohm at the time of his visit, as above stated. The testimony of Dooley was substantially the same as that of Stradley as to the visit to Mrs. Rohm

and with respect to the agreement. He testified that the substance of it was that they were to adopt Ollie and give her their name and educate her and at their death leave her what they had. That agreement, according to the testimony of these witnesses, was signed by Dr. Strecker, Mrs. Strecker and Meyer. It was written in pen and ink and there was a seal after each name.

The testimony of the two detectives is sharply contradicted by that of William L. Rohm, who testified that he was in an adjoining room at the time of the alleged conversation; that Mrs. Rohm did not come out of the room in which they were talking and get some papers and go back into the other room and show them to the detectives, but, on the contrary, that she came to him and he gave her some money which she used in paying them for the work which they had done up to that time. So far as the evidence in this case shows, neither of the two detectives was ever at the home of Mrs. Rohm again subsequent to the time of this alleged conversation. No one else, aside from them, seems to have ever seen the original of this paper or known of its existence. Rohm testified that he never at any time saw such paper, and appellant testified that the first she knew of it was when told of it by Stradley at St. Louis, in 1913.

The evidence by which the existence of this contract is sought to be established is not of the most satisfactory character. The circumstances testified to by the two detectives are improbable and extraordinary when it is considered that at the time this alleged contract is claimed to have been shown to them Mrs. Rohm was terminating her relations with them; that they were practical strangers to her, and that she had no reason for confiding to them matters of that character, which she had never before this time even confided to appellant, with whom she lived in the closest relationship, or, in fact, to any other living witness, so far as the evidence in the case shows. It also seems strange

that if the father of appellant contemplated leaving East St. Louis and went to Dr. Strecker and his wife and made this agreement, he so suddenly departed without seeing that his child was safely delivered into their possession to be cared for by them, or at least without those in his household learning of the arrangements he had made, so that they might see that the same were carried out after he left. It is also strange that Dr. Strecker and wife, after making such an arrangement, should have hesitated so long after his departure before receiving appellant into their home, which, if the contract in question had actually been made, they had agreed to do independently of the question as to whether or not Meyer remained in or left East St. Louis. No one knows exactly what the arrangements were by which the appellant was taken into their home except Dr. Strecker and his wife and the grandmother, all of whom were dead at the time of the trial. The aged housekeeper, who was there at the time, did not hear all of the arrangements, but her testimony tends very strongly to show that Dr. Strecker first came to the Meyer home about two weeks after Meyer left and that there was talk between him and the grandmother about his taking appellant; that two or three days later the grandmother packed up the appellant's things and sent her with an aunt, a Mrs. Koch, to the home of Dr. Strecker, where the child was left and thereafter remained. The evidence further shows that the grandmother made all of the arrangements by which homes were found for the other children. There is no satisfactory evidence in the record to show that she did not also make whatever arrangements were made by which appellant was taken into the home of Dr. Strecker and wife, and we think, when all of the evidence in the record is considered, together with the circumstances surrounding the appellant's being received in the home of Dr. Strecker, that it tends most strongly to show that whatever agreement or arrangements, if any, were made to that end, were made by the grandmother with

Dr. Strecker after Meyer had left. The evidence also tends to show that while appellant was frequently spoken of by Dr. Strecker and his wife as their child or their adopted child, in later years, and particularly after Mrs. Strecker's marriage to Rohm, she was called "aunty" by appellant instead of "mother." A number of letters and postal-cards written by Mrs. Rohm to appellant are in evidence, some written to appellant while she was Mrs. Nester and others after she became Mrs. Mould, in all of which Mrs. Rohm signed the same "Aunt Lou." There is also evidence in the record tending to show that at different times Mrs. Rohm spoke about making some arrangement or provision so that in case of her death appellant would get something from her estate, and that at one time she contemplated making a will for that purpose but that such arrangement was never consummated. While there is abundance of evidence in the record to show that Mrs. Rohm took a deep interest in appellant and her affairs and treated her with the utmost kindness and consideration, still we are inclined to agree with the findings of the master and of the chancellor that there is not sufficient satisfactory evidence in the record to establish the making of the contract sought to be specifically enforced in this case.

In this case the burden of proof is upon appellant to prove the contract of which she seeks specific performance, by the most clear and satisfactory evidence. She must not only establish the execution of the contract and full performance of the same upon her part, but also must show that the agreement was full and complete, certain, fair and just in all its parts and provisions. (*Tryce* v. *Dittus,* 199 Ill. 189; *Dreiske* v. *Eisendrath,* 214 id. 199.) Where the contract sought to be specifically enforced requires the making of a different disposition of the property of a deceased person from that which the law prescribes, a court of equity will look with jealousy upon the evidence offered in support of such contract and will weigh such evidence in the

most scrupulous manner. (*Sloniger* v. *Sloniger*, 161 Ill. 270; *Woods* v. *Evans*, 113 id. 186.) Where it is alleged to have been reduced to writing and been lost or destroyed and the agreement is attempted to be established by parol evidence, its existence and terms must be established with the same certainty as if the contract rested entirely in parol. (*Woods* v. *Evans, supra.*) All of the authorities agree that in order to entitle a party to a specific performance of a parol contract for the conveyance of land the contract must be certain and definite in its terms and established by evidence free from doubt or suspicion. (*Richardson* v. *Lander*, 267 Ill. 181; *Mitchell* v. *Art Institute of Chicago*, 269 id. 381.) In *Reynolds* v. *Wetzler*, 254 Ill. 607, it is said: "The law is well settled that a court of equity will not decree the specific performance of a contract the existence of which depends upon parol testimony, unless the proof is clear and conclusive of its existence and terms. In such case the evidence must be clear and explicit, leaving no room for reasonable doubt, and the contract must be certain and all of its terms clearly proven.—*Wallace* v. *Rappleye*, 103 Ill. 229; *Folsom* v. *Harr*, 218 id. 369; *Chicago and Eastern Illinois Railroad Co.* v. *Chipps*, 226 id. 584; *White* v. *White*, 241 id. 551."

In the present case there is not only grave doubt as to the existence of the contract relied on, but the proof of its terms and provisions is of a most unsatisfactory character. It rests entirely upon the memory of two witnesses, neither of whom was interested in it or had any occasion to remember its terms or provisions, and who made a casual examination of it some six years before and at a time and under such circumstances that they had no reason whatever for fixing any of its terms or provisions in their minds. Neither of the witnesses testified to the wording of the contract exactly as alleged in the bill, and as to the contract testified to by them it is a grave question whether or not it is supported by a sufficient consideration to permit

of its specific enforcement in a court of equity. But we have not deemed it necessary to enter into a discussion of this phase of the question, for the reason we are of the opinion that appellant has failed to establish the contract relied upon, and its essential terms and provisions, by the character of evidence this class of cases requires.

For the reasons given, the decree of the circuit court of St. Clair county will be affirmed.          *Decree affirmed.*

Mr. JUSTICE FARMER, dissenting.