(No. 14052.—Reversed and remanded.)
CHARLES T. ANDERSON, Appellee, *vs.* AUGUSTANA COLLEGE
*et al.* Appellants.

*Opinion filed October 22, 1921—Rehearing denied Dec. 9, 1921.*

1. SPECIFIC PERFORMANCE—*when a witness cannot testify that there was an agreement which was put in writing.* In a suit for the specific performance of an alleged parol contract for the conveyance of land by a person since deceased, a witness cannot be allowed to testify that an agreement was put in writing where he is unable to state substantially the language constituting the agreement, as the question whether or not there is an agreement must be determined from the language of the parties and not by the judgment of a witness.

2. SAME—*evidence to support parol contract for conveyance of property of deceased person will be carefully scrutinized.* Courts of equity scrutinize with the most scrupulous care the evidence offered in support of an alleged parol contract to make a disposition of the property of a deceased person different from that which the law prescribes.

3. SAME—*parol contract for conveyance must be clearly proved before it will be enforced.* The proof which will justify a court in decreeing specific performance of a parol contract must be clear and conclusive, and there must be no reasonable doubt that the contract was made and all of its terms must be clearly proved.

4. DEEDS—*mere fact of alteration raises no presumption as to when it was made.* The mere fact of an alteration of an instrument raises no presumption as to when it was made, but the question as to when, by whom and with what intent the change was made is one of fact, to be determined from the evidence.

5. SAME—*suspicious alteration raises presumption against the instrument.* Where an alteration is suspicious in appearance and not satisfactorily explained a conclusion of fact follows against the instrument, but the appearance of the instrument may furnish a satisfactory explanation without extrinsic evidence.

6. SAME—*when grantee is not entitled to reformation of deed.* Where an alteration of a deed is not suspicious in appearance, is in the same handwriting as the rest of the deed and written apparently at the same time by the scrivener who prepared the deed for the grantor, the grantee will not be entitled to a reformation by striking out the alteration where he has subsequently made admissions indicating that his title was consistent with the alteration,

and where the only evidence in support of a reformation is the testimony of a witness, more than twenty years after the deed was executed, that the alteration was not on the instrument when he witnessed its execution.

APPEAL from the Circuit Court of Henry county; the Hon. FRANK D. RAMSAY, Judge, presiding.

ROBERT W. OLMSTED, for appellants.

KENWORTHY, DIETZ, SHALLBERG, HARPER & SINNETT, for appellee.

Mr. JUSTICE DUNN delivered the opinion of the court:

Charles T. Anderson, claiming to be the owner in equity of the undivided one-half of 120 acres of land in Henry county, filed a bill for the partition of the land between himself and Charles Herman Peterson, whom he alleged to be the owner of the other half interest, subject to a mortgage for $5000 given to D. L. Cowden. Besides Peterson and Cowden, Augustana College, the General Council's Foreign Mission in India, corporations, and William Ringle, administrator with the will annexed of the estate of William Bjorklund, were made parties defendant, and the prayer of the bill as to Augustana College and the General Council's Foreign Mission in India was, that they be decreed to have no interest in the premises and that they be enjoined from asserting any title by virtue of a joint will of William Bjorklund and Tilda L. Bjorklund. The bill also prayed for the reformation of two deeds,—one by William Bjorklund to the complainant and another by the complainant to Charles Herman Peterson. Answers were filed, the cause was referred to the master, who reported the evidence with his conclusions, upon a hearing the court decreed for the complainant as prayed in his bill, and the two corporations appealed.

The complainant's title as averred by him rested, first, upon an alleged contract between William Bjorklund and Tilda L. Bjorklund, his wife, on one side, and the complainant and his parents on the other, by which the Bjorklunds agreed to leave him all their property when they died and of which the complainant prayed the court to decree a specific performance; and secondly, upon the deed from William Bjorklund to the complainant, which the complainant sought to have reformed.

The bill alleged that William Bjorklund and Tilda L. Bjorklund were married prior to the year 1873 and had three children, all of whom died within a week in the year 1880, and they had no other children afterward; that the complainant was born in Sweden in the year 1873 and lived there with his parents; that Mrs. Bjorklund was a sister of the complainant's mother, and she and her husband desiring to induce the complainant to leave his parents and native land and come and live with them and take the place of their deceased children, by letters and correspondence with the complainant's parents, and otherwise, held out and offered to the complainant that if he would leave his parents and native land and come to America and make his home with them until he arrived at the age of twenty-one years, they, in consideration of his coming to America and making his home with them, would make him their sole and only heir-at-law and would give him at their deaths all the real and personal property of which they died seized and possessed. This was the contract which the complainant alleged and sought to have specifically enforced. The bill contained voluminous allegations in regard to the acceptance of the offer by the complainant's parents and the performance of the contract by the complainant which we do not regard as material to our consideration of the case. Complainant lived in the family of William and Tilda L. Bjorklund until her death, on July 16, 1899. After her death a joint will executed by herself and her husband on March 1, 1897, was

admitted to probate as her will. It provided for the payment of the debts of the testator and testatrix, and gave the survivor the power to use, sell and convey the property left by the first to die and to use and dispose of the revenue as he or she might wish, provided that the survivor should not dispose of the estate he or she might leave, either by will or in any other way, than as provided in the joint will, which directed that a half of what remained after the death of both the testator and testatrix should go to the General Council's Foreign Mission in India and half to Augustana College. The issue in regard to the reformation of the deeds will be stated later.

The allegation of the bill is that the contract which is sought to be enforced was evidenced by letters and correspondence with the complainant's parents and otherwise. The complainant and his parents were living in Sweden and the Bjorklunds in Menard county, Illinois. No letters or correspondence between them appear in the record. The only document referring to the boy's coming to the Bjorklunds is a letter written by Bjorklund to Gust O. Johnson, the brother of Mrs. Bjorklund and the complainant's mother. Johnson had been living at the Bjorklunds at the time their three children died, in the fall of 1880. The next March or April he returned to Sweden, where he remained until June, 1883. He received this letter in March, 1883, and showed it to the complainant's parents. The part referring to the complainant is as follows:

"I thought you had forgotten both America and relatives. Regarding the Slatte boy we have carefully weighed the matter, and if they are willing to give him up then we will receive him. This is a serious undertaking on our part, and we naturally would have to assume the responsibility, in his parents' stead, of his proper bringing up, both in a bodily and a spiritual way, and this requires grace from the Lord our God to adapt ourselves to right parents. Assuredly, according to God's own word, there rests a big re-

sponsibility upon every father and mother for their care while little,—little plants we might call them. They are in truth plants. Should you send him along with someone and are not coming yourself, do the best you can in the matter. You understand this as well as I do, but you will no doubt be his companion,—at least I think so. * * * If you send the boy along with someone, you will, of course, write me when he leaves home."

Johnson testified that before he went back to Sweden he had some conversation with his sister and her husband about his taking one of the boys of the sister in Sweden if Johnson came back, especially the oldest one. They said that they would like to have the boy come over if Johnson came back, and that he should bring the boy with him. Johnson said that when he got over to Sweden the Bjorklunds wrote over about that, and that he let the complainant's father and mother read the letter he got from Bjorklund. When he got to Sweden he went to the home of the father and mother of the complainant to live at his sister's. He testified that before he got this letter he had written a letter to Mr. and Mrs. Bjorklund saying that he was doubtful whether he was coming back or not; that his father was still living and he was getting old, and he wrote back to inquire whether they wanted Johnson to send the boy if he didn't come himself and whether he should send him with someone else who might be coming over. This was everything that he could remember that was in the letter he sent to them. He just wanted to find out whether they wanted the boy if he brought him himself or sent him with somebody else. He testified he received quite a number of letters from them while he was over there but he was not able to produce any, and to the question whether he remembered the contents of those letters so far as they related to the boy, his answer was that he remembered they were willing to have the boy come over here. When he showed the letter to the complainant's father and mother he said they

were willing to let him go under the condition the Bjork-lunds promised to take him and that if he was going he should go in his company, and he did bring the boy over. Because Bjorklund and his wife promised to raise the boy up as their own child his parents consented to let him come over here. That was Johnson's understanding.

Andrew Anderson was a witness who was introduced for the purpose of proving the alleged contract. He was a cousin of Tilda Bjorklund. He came from Sweden in 1880, when he was about twenty-two years old, and came first to the farm where the Bjorklunds were living, in Menard county. The children died a few months after he came there, and Gust Johnson went back to Sweden on a visit. During that winter he was at the Bjorklunds' house occasionally and talked with them about complainant's coming to live with them. Bjorklund showed him some letters that he had written, but Anderson did not read them,—did not see what was written. Bjorklund said it would be a good thing if he got somebody there to help him in his old age; that they needed somebody there to care for them and their things in their old age; that he was going to give complainant everything that was left after their death; that he was going to give him their property after they died; that they were going to raise him just like their own boy. Anderson testified he had a conversation with Mrs. Bjorklund, who said she was glad to have the boy; that she was glad to have a child to take care of, and they were going to give him everything they had after they were both dead; that they wanted a boy to take the place of their own children who had died,—someone to take care of and someone to take care of them and their things when they got old,—and he was going to have whatever they left when they died. They did say something about writing a letter, but it was so far back Anderson could not tell what they said. He testified that they agreed to give the boy everything they had at their death, and to the leading question, "I am asking

you whether they had put their agreement in writing?" he answered, "Yes, they did." He said, "They told me they were going to give him just what they had and that they had put that in a letter." When asked, "Who did they send the letter to after they had written it?" his answer was, "His father and mother, over in Sweden, I think." On cross-examination he testified: "I didn't talk with William Bjorklund or Tillie Bjorklund about Charlie until he came over,—not until after he got here. I talked to both Mr. and Mrs. Bjorklund about Charlie after he came over here. I had a conversation with them two or three times. I cannot tell you just how many times. I am sure I talked with them that many times. The first time I talked with them was in the fall or in the winter the same year Charlie came over. He came over in 1882 or 1883,—I cannot recall just the date. He came in the spring and that following fall I talked to him about it. The first time I had this talk about Charlie, William Bjorklund and his wife were sitting together when we talked. It was around the fall somewhere. It is a long time ago. We were on the farm right there where they lived. I think it was in the kitchen. It was in the kitchen. I can see that place now in my mind. I was then about twenty-five years old. None of the hired men were there at that time,—just Mr. and Mrs. Bjorklund and myself and Charlie Anderson. I should judge I talked to them three times about this boy, Charles T. Anderson, and I think the first time was in the fall. Two or three months afterward I happened to come up there and stopped in. We were talking there about Charlie. That was the next time. I don't remember when any of those letters that had been sent over to Sweden regarding Charles T. Anderson had been sent. I don't recall whether Bill told me that he was coming over before he got here or not. Probably Bill did tell me. I don't recall now. I don't remember just exactly how long I stayed in that county." The following is a part of the cross-examination and re-direct examination of this witness:

Q. "Didn't Mrs. Bjorklund say that if Charlie was a good boy he would get their property when they died?

A. "Yes.

Q. "Charlie was then about thirteen years old?

A. "Yes.

Q. "They said it like this, didn't they, 'If Charlie is a good boy he is going to get some property?'

A. "Yes.

Q. "Some property if he is a good boy?

A. "Yes."

On re-direct examination he was asked: "They said that was their agreement in writing to his parents?" and answered, "Yes."

It is apparent that this witness had no recollection of the contents of any letter which was written by the Bjorklunds or of any statement by either of them as to what was contained in any letter. His examination shows that on direct examination and on cross-examination he was easily led to adopt the language of the counsel examining. His answers to questions fell in with the line indicated by the questions asked and his answers do not represent his memory. There is no evidence as to the contents of any letter. The testimony is simply the witness' recollection, more than forty years after the occurrence, as to casual conversations about a matter in which he had no concern, as to what the agreement was that had been put in writing in a letter which the witness never saw, supposed to have been written forty years before, which there is no evidence that the person addressed ever received. It cannot be shown by parol evidence that an agreement was put in writing when the witness is unable to state substantially the language constituting the agreement. Whether or not there is an agreement must be determined from the language of the parties and not by the judgment of the witness.

There is no other evidence in the record of any communication between the Bjorklunds and the parents of the

complainant. The agreement averred is, that if the complainant would leave his parents and his native land and come to America to make his home with them until he arrived at the age of twenty-one years, they would, in consideration of his coming and making his home with them, make him their sole and only heir-at-law and would give to him at their deaths all the real and personal property of which they died seized and possessed. No such contract was shown by the testimony of either Anderson or Johnson. The letter which Johnson received and showed to the boy's parents made no reference whatever to property, and the only undertaking which could be implied from the letter was that the Bjorklunds were willing to receive the boy and assume the responsibility, in his parents' stead, of his proper bringing up, if his parents were willing to give him up.

The complainant testified that after William Bjorklund's death he wrote over to Sweden and told his parents to send him the agreement, and he received a letter from his mother enclosing a letter of contract or agreement with the Bjorklunds about a year before he testified, in March, 1920. This letter he says was burned up in a fire which occurred in the attic of his house in January, 1919, but no evidence of the contents of this letter or that it was written by the Bjorklunds was introduced.

Contracts which a court of equity will specifically enforce must be fully and completely proved and their terms must be shown with certainty. Courts of equity scrutinize with the most scrupulous care the evidence offered in support of a contract to make a disposition of the property of a deceased person different from that which the law prescribes. (*Sloniger* v. *Sloniger*, 161 Ill. 270; *Woods* v. *Evans*, 113 id. 186.) The proof which will justify a court in decreeing specific performance of a parol contract must be clear and conclusive, and there must be no reasonable doubt that the contract was made and all of its terms clearly proved. (*Mould* v. *Rohm*, 274 Ill. 547; *Reynolds* v. *Wetz-*

*ler,* 254 id. 607; *White* v. *White,* 241 id. 551.)  The exist-
ence of the contract alleged in the bill is not shown by the
evidence.  The letter which was produced does not tend to
sustain it in any particular.  The supposed letters on which
the decree must rest are not proved at all.  If the testimony
of Andrew Anderson is accepted as proof that Bjorklund
wrote letters to the complainant's parents regarding his
coming to America, it does not pretend to show that those
letters were ever received by the parents and does not pre-
tend to state what the contents of the letters were.  He
simply states his conclusion as to the effect of the language
used in the conversation to establish an agreement without
stating the language, and is uncertain even as to the person
to whom the letters were sent.  Instead of being clear and
conclusive and leaving no reasonable doubt, the testimony is
vague and uncertain and creates no presumption that the
version of the agreement contended for by the complainant
is in accordance with the statements in the letter, if any such
letter ever was written and received.  There is no satis-
factory proof of any correspondence between the Bjork-
lunds and the complainant's parents.  The complainant came
with his uncle, Gust Johnson, to Menard county, Illinois,
and lived with his uncle and aunt, the Bjorklunds, for many
years.  The evidence contains many statements of William
and Tilda Bjorklund of their intention to give their property
to the complainant at their death, of satisfaction with his
work and expectation that he would have all their property,
but the record is substantially barren of evidence to establish
that this intention and expectation arose out of any contract
which they had made.

On October 31, 1899, after the death of Tilda Bjork-
lund, William Bjorklund executed a warranty deed to the
complainant, which the bill alleges was a deed of all of
Bjorklund's interest in the land in question, reserving a life
estate to the grantor, but it is alleged that the deed was
changed after its execution and delivery and before it was

3C0—6

recorded, without the knowledge of the complainant, so as to convey to him the undivided one-half of the premises. This deed the bill seeks to have reformed by striking out the words "undivided one-half." At the same time with the execution and delivery of the deed Bjorklund executed a written lease of the premises to the complainant for the period of Bjorklund's life, by the terms of which the complainant agreed to farm the land and furnish all the labor therefor and give to Bjorklund one-half of all the profits, pay one-half of the taxes and pay one-half of all the debts of Bjorklund, which amounted to about $2300. Shortly after the execution and delivery of the deed and lease Bjorklund became insane, and on November 16, 1899, a conservator was appointed for him and he was committed to a State insane asylum, where his insanity continued until his death, on March 15, 1915. The complainant continued to occupy the premises until January 1, 1912, when he assigned the lease to Charles Herman Peterson.

The deed of October 31, 1899, executed by Bjorklund to the complainant, was written by John V. Streed, a lawyer in Cambridge, who was also a notary public and took the acknowledgment of its execution. The original deed has been certified to us. It is written on an ordinary statutory warranty deed blank, and the written part is all in the handwriting of Streed. In the description of the property, following the printed words "the following described real estate," the deed shows an interlineation in the phrase "all his interest," consisting of a caret between the words "his" and "interest" and immediately above, the words, "undivided one-half," in the handwriting of Streed. The deed is signed by C. V. Young as a witness. More than twenty years after witnessing the execution of this deed Young was called to testify in this case, and stated that at the time of the execution of the deed he had just gone in the butcher business three or four doors north of Streed's office. About ten o'clock in the morning Streed came to the shop and asked

him to come over to Streed's office to witness a deed.   He
went to the office and in the back room found Bjorklund
and Anderson.   The deed was lying on the desk and Streed
said he wanted him to sign it as a witness.   He read it over
before he signed it.   The interlined words, "undivided one-
half," were not in the deed when he signed and witnessed
it or when Bjorklund signed it, and the revenue stamps were
not on the deed.   After the witness signed the deed it was
signed by Bjorklund.   Streed then signed it and put his
seal on it and handed it to Anderson.   Young then went out.
He did not recollect that anything was said either by Streed
or Anderson when Streed handed the deed to Anderson.

Anderson testified, over objection made to his compe-
tency, that he heard Bjorklund tell Streed that he wanted
him to write out a deed, in which he deeded the 120 acres
to Anderson, reserving a life estate to himself.   The writ-
ten part of the deed, except the signature of Bjorklund and
the signature of Young as a witness, was written by Streed,
and the words "undivided one-half," between the words
"his" and "interest," that are written in pen and ink, were
not there when Streed gave him the deed or when the deed
was signed by Bjorklund or Young or when Streed signed
it.   After they all signed it Streed handed the deed to
Anderson in Streed's office, about ten o'clock in the fore-
noon.   Streed stated that he had no revenue stamps to put
on the deed but would have them about twelve-fifteen or
one o'clock, and asked Anderson and Bjorklund to come
back so Bjorklund could put his signature on the stamps.
About fifteen minutes after twelve o'clock they came back
to Streed's office.   The stamps were put on the deed and
Bjorklund signed his initials on the stamps.   Then Streed
said that he had some other papers to take over to the
recorder's office and that he would take the deed and have
it put on record.   Up to that time the interlineation, "un-
divided one-half," was not on the deed.   The deed was
filed for record at three o'clock that same day and the inter-

lineation had then been made. Anderson never authorized that interlineation and did not know of it until after Bjorklund was sent down to Watertown, on November 16, when he called at the recorder's office to get the deed. When he discovered the interlineation he asked Streed who did it, and Streed did not say much about it. Anderson told him that he wanted that straightened out, and he told Anderson that he couldn't do anything then and should wait until Bjorklund either got better or was dead, and advised him that there was nothing that could be done. Streed having died his testimony was not available.

The complainant went into possession of the whole farm under his lease and continued to occupy it, paying rent to the conservator, until 1912. In 1911, having borrowed $5000, secured by a mortgage on the undivided one-half of the farm, he wanted to borrow $2000 more and made an application to Augustana College for a loan of that amount on the security of his interest in the property. He wrote a letter to the college in which he stated: "I think you know that one-half of that place goes to the college, as Mr. Telleen spoke of selling my half to the college a year or so ago." Several letters were exchanged between the complainant and Kempe, of the college, and between Kempe and the complainant's attorney, Telleen. The complainant admits that he made an application for a loan but denies writing the letter containing the statement that one-half of the place goes to the college. Evidence was introduced to show that the handwriting of the letter was the same as that of other documents which are admitted to be in the handwriting of the complainant. The original letter and the signatures of the complainant to other writings have been certified to us, and the preponderance of the evidence is that the letter in question is in the handwriting of the complainant. In addition to that, Dr. Andreen testified that when the complainant came to see about the loan Kempe called witness in to talk with him, and in that conversation the complainant said

that he wanted the loan and thought that the college ought
to grant it to him on one-half of the farm as one-half of the
farm was going to the college anyway, and he felt that the
college should do him this favor. Later in the same year
Charles Herman Peterson bought the undivided one-half of
the land of Anderson. Peterson understood that Augustana
College claimed an interest in the land by virtue of the will
of Mr. and Mrs. Bjorklund and he wanted to purchase the
whole farm. He wanted a contract to buy the other half
from the college at the same price he was paying Anderson
for his interest, so that he could get the title to the whole
farm eventually. He and Anderson went to the college, and
he testified Anderson told Kempe he was selling his interest
to Peterson and that they had come down to see if Peterson
couldn't get a contract from the college so that he could pay
the college, if they got the land, the same price that he had
paid Anderson for his interest.

The action of the complainant for many years after the
forgery of the deed which deprived him of the title to half
of the land, if what he stated is true, was inconsistent with
the truth of his statement. His admission to the college
when attempting to make the loan and his admission of its
rights at the time of the sale to Peterson can only be ex-
plained on the theory that the deed of October 31, 1899,
conveyed to him only the undivided one-half of the land.

The appellee insists that the alteration of the deed is
apparent on the face of the instrument, and that it is in-
cumbent on the appellants, who benefit by the alteration, to
show that it was made before delivery. The mere fact of
an alteration of an instrument raises no presumption as to
when it was made. The question as to when, by whom and
with what intent the change was made is one of fact, to be
determined from the evidence. When an alteration is sus-
picious in appearance and not satisfactorily explained, the
conclusion of fact follows against the instrument, but the
appearance of the instrument may furnish a satisfactory ex-

planation without extrinsic evidence. *(Hutchison* v. *Kelly,* 276 Ill. 438; *Waggoner* v. *Clark,* 293 id. 256.) In this case, therefore, the question was to be determined from all the evidence as to whether the deed was altered after execution. The alteration itself was not suspicious in appearance. It was in the same handwriting as the rest of the deed, written apparently at the same time. The testimony of the witness to its execution that the words interlined were not there at the time he witnessed the execution of the deed is not satisfactory evidence that they were not inserted with the consent of the grantor and grantee before the deed was finally delivered. It is rather remarkable that the witness should be able to testify, after the expiration of so long a time, to the fact whether the interlineation was there or not at the time he witnessed the deed, but the fact that it was not there at the time is no evidence that it was not inserted before the final delivery of the deed. The deed was intended to be brought back, and was brought back to the writer of it for completion, after its attestation by the witness. Immediately after the deed was completed by attaching and canceling the revenue stamps it was left by the grantee with the lawyer who wrote it, to be filed for record. Within an hour or two it was filed for record, and when so filed the interlineation was there. The interlineation was made by Streed, who wrote the deed. He could have had no possible motive for making the change, without authority, after the deed was delivered. The complainant says he discovered the interlineation within two or three weeks after the deed was executed, when he got it from the recorder's office, and for ten or twelve years he made no effort to have the deed corrected. Then, when he undertook to borrow money on the property and to sell it, he voluntarily made a statement that the other half of the property would eventually go to the college,—a statement which is consistent only with the fact that his title was only to one-half of the property. The evidence on this branch of the

case is insufficient to justify the court in rendering a decree for a reformation of the deed.

The decree of the circuit court will be reversed and the cause remanded, with directions to dismiss the bill.

*Reversed and remanded, with directions.*