(No. 26669.—)
WILLIAM H. ANDERSON, Appellant, *vs.* JOHN FRANKLIN ANDERSON *et al.*, Appellees.

*Opinion filed September 25, 1942.*

Roswell B. O'Harra, for appellant.

T. MacDowning, for appellees.

Mr. Justice Thompson delivered the opinion of the court: ·

This case was filed in the court below by appellant, William H. Anderson, alleging the making and seeking of specific performance of a parol agreement between himself, his brother, John Franklin Anderson, and his sister, Ina F. Thomas, who were three of the four children and heirs-at-law of one Robert Anderson, deceased, by which they agreed that regardless of the provisions of their father's will, the property owned by the said Robert Anderson at his death should be divided equally, share and share alike, among his four children, so far as the property was not devised to any other person, and further agreed that in the event their brother, Raleigh B. Anderson, whose whereabouts were unknown, was not found or located within a reasonable time after the death of Robert Anderson, all the property of Robert Anderson should be divided equally among the three children, William H. Anderson, John Franklin Anderson, (known as Frank Anderson,) and Ina F. Thomas, so far as there was no property devised to Raleigh B. Anderson or to other persons than said three children.

The said John Franklin Anderson, Ina F. Thomas, and Raleigh B. Anderson were made defendants to the suit, as were also the Union National Bank of Macomb and Ray Deener, the last two because of allegations that they were in possession of certain funds and grain rent belonging to the estate. These last mentioned defendants were defaulted and took no part in the case below nor in this appeal. The defendant Raleigh B. Anderson was served by publication and also defaulted. The only parties before this court on appeal are the appellant, plaintiff below, William H. Ander-

son, and the appellees, John Franklin Anderson and Ina F. Thomas, defendants below.

The trial court decreed specific performance of the contract as to the personal property in said estate, holding the contract had been proved as to the personalty, but denied relief as to the real estate on the ground that the contract had not been proved as to it. This appeal is only from that part of the decree finding that the amended complaint had not been proved so far as it related to the real estate and dismissing the amended complaint so far as it related to real estate. There was no appeal or cross-appeal from that part of the decree relating to the personal property. Appellant contends that there was exactly the same evidence as to personal property as to the real estate; that relief cannot be with consistency granted as to the one and denied as to the other; that because no appeal from that part of the decree as to personal property has been taken, this must be deemed to be correct; and upon this theory counsel assign as error and argue with apparent seriousness that the part of the decree appealed from must be reversed in order to harmonize the same with and give consistency to that part of the decree not before this court for consideration. Such is not the purpose and function of this court in deciding upon matters properly before this tribunal, and we are not so constricted in the instant case.

Robert Anderson, whose estate is involved in this case, died January 4, 1939, leaving the appellant and appellees, his children. He also had another son, Raleigh B. Anderson, whose whereabouts were unknown and who had not been heard from for many years. Robert Anderson at the time of his death owned a farm of one hundred and eighty acres in McDonough county, an undivided three-fourths interest in a house and lots in the city of Macomb, twenty-five shares of stock of Colchester Building & Loan Association of the value of $2500, eight shares of stock of Central Illinois Public Service Company, $1858.62 on deposit

in the bank, about $400 cash on his person, and certain grain and other personal property. By his will he bequeathed $25 to his son, Raleigh, if living, $300 to Lizzie Anderson, a sister, and $200 each to two grandsons, children of Raleigh. He devised to appellant the city property in Macomb, in fee simple, and to appellees his farm in fee simple. He also devised and bequeathed to appellees all the residue of his property, and appointed them as executors of his will without bond. Testator then, by the ninth and last clause of his will, recited that he had endeavored to make an equitable distribution of his property and hoped it would be received as such, and if any legatee or devisee opposed the admission of his will to probate, or caused to be filed any contest of its validity, then any and all provision made in behalf of such legatee or devisee was withdrawn and revoked.

Robert Anderson was a widower and had for about a year prior to his death lived alternately, one week with appellant and one week with appellee, Ina Thomas. He died suddenly at the home of Mrs. Thomas. For a month subsequent to his death Mrs. Thomas was ill and unable to transact any business, but on February 5, 1939, by prearrangement, the appellant and appellees met at the home of Mrs. Thomas for the purpose of examining the contents of their father's box of papers. Porter Thomas, the husband of Ina Thomas, was also present, these four being the only persons present at that time, on which occasion the agreement is alleged to have been made. Appellant alleges in his amended complaint that, at this meeting and before the will was opened and read, it was agreed between the three, appellant and appellees, at the instance of Mrs. Thomas, that regardless of the provisions of the will, their father's property should be divided equally, share and share alike, among the four children, and in the event Raleigh was not found in a reasonable time, all of the property of the father should be divided equally among the three chil-

dren then present. Appellant also alleged partial performance of this agreement by division of certain moneys and proceeds of certain personal property belonging to the estate. Appellees in their answer deny the making of the agreement. They admit giving him certain money and property belonging to the estate, but deny that any such gift to him was in pursuance of an agreement.

In regard to what happened at the meeting on February 5, appellant testified that before the box was opened, Mrs. Thomas said "Let's all make an agreement that we shall divide share and share alike regardless of what the will says;" that she asked each of her two brothers present what he said, and each said it was all right with him; that her husband spoke up and said that was the only way to do it, and as long as he had anything to say it would never be done any other way; that something was said that their brother Raleigh was to share with them, share and share alike; that it was said that in a certain number of years if he did not show up and could not be found, they would have to go before the court and declare him dead and divide that among the three of them; that after that conversation and before the will was taken out of the box, Mrs. Thomas divided $420 of their father's money among them, giving herself and her two brothers each $105 and leaving $105, which she said would be Raleigh's. On cross-examination appellant testified that he did not remember saying anything further about the agreement to divide after the will was taken from the box nor did he remember Mrs. Thomas saying anything further at that time; that Mrs. Thomas at the time the box was opened said, "Now, we'll keep one-fourth for Raleigh and put it away for him if he ever turns up."

The above is all the evidence of appellant as to the making of the agreement. His wife and two daughters testified to subsequent conversations with Mrs. Thomas, outside the presence of the other parties, in which she told

them that they had agreed to share and share alike. The testimony of Mrs. Thomas and these witnesses is conflicting as to what was said in these conversations.

Ina Thomas testified that at the time the box was opened on February 5, 1939, nothing was said about the estate before the will was read, except that her husband said "There is only three of you left, and don't have any trouble or hard feelings," to which no one made any reply; that after the will was read and they had been clear through the box, appellant pushed the box back and said, in effect, that he did not get a thing but would not say a word; that she then said, "Well, here's this money. Now let's try and do what's right and what's fair and square;" that appellant said, "Well, we might just as well divide this money four ways;" that nothing else was said about four ways that she remembered; that she said if they were going to divide the money four ways, they might just as well divide the rest of what was in the box; that as she remembered appellant said, "Well, if you are going to do that, I will take the farm and farm Raleigh's part and I will pay you rent;" that she said, "Let's wait and see;" that neither Frank Anderson or Porter Thomas said anything and that nothing further was said about the farm at that time; that as she remembered, appellant said he didn't get much, that the house wasn't much; that nothing else was said; that the money was divided substantially as testified to by appellant; that they didn't decide to do anything that day with reference to the stock that was in the box; that they said they would do the rest the same way; that appellant said if they were going to pool that money, he was willing to sell the house and the farm and Frank's place and pool the money all together; that he said that after the will was read; that she thought she said "Not for a while," and that neither her brother Frank nor her husband, Porter Thomas, made any reply. On cross-examination she testified that they agreed the day the will was opened that everything in the box should be

divided four ways; that appellant spoke about the division; that he said they would pool it; that if they were going to pool the $102, they might just as well do the rest the same way; that he said that if they were going to do that, Frank would sell the house, the land and the place, and they would put it all together, but the others did not agree to that; that she said they would wait; that it was following the statement of Porter Thomas about not having any trouble or hard feeling that she divided the $420 four ways and agreed to divide the contents of the box four ways, and that it was following that statement that appellant said, "If you're going to do that, I will put in the house and put the farm in and we'll divide everything four ways;" that Frank never said anything when appellant said that and all she said was "We'll wait on that;" that there at that time they never did say anything about any division share and share alike; that there was a statement made by her that she would hold Raleigh's share, but nothing was said as to what would be done with Raleigh's share if he didn't show up nor as to how long she was to hold it; that there was nothing said on that date about giving appellant anything of the C.I.P.S. stock or the building and loan stock; that it was the car money and the dividend from the building and loan they agreed to give him and the $102 that was there that they divided; that as to those they agreed that Raleigh was to have an equal fourth; that the dividend from the building and loan was specifically mentioned, although it had not come in, but the stock itself was not mentioned.

Appellee John Franklin Anderson testified that on February 5, 1939, there was no conversation relative to the estate prior to the time the will was read; that after the will was read appellant stated to Mrs. Thomas that he did not have a thing, and "that belongs to you and Frank;" that Porter Thomas said, "There is only you is left. And don't have no trouble whatsoever;" that neither he nor

Mrs. Thomas said anything to that; that the $420 was divided as the other witnesses testified; that nothing was said about the stock at that time; that they said to appellant that they would sell the automobile; that nothing was done with the building and loan stock at that time. On cross-examination he testified that after the will was read they might have had a little talk something about where they didn't think maybe their father had done the right thing, or something like that; that he said it didn't look to him that it was just right, but that he said nothing more; that Mrs. Thomas said nothing about dividing share and share alike regardless of the will; that before the will was read appellant said "If I don't get a damn thing I will never say a word;" that after the will was read he said he wouldn't get a thing, saying, "Sis, that belongs to you and Frank."

Porter Thomas testified that there was no conversation in regard to the estate before the will was read; that after the will was read appellant said, "There it is. There is the will. I am cut clear off except the home;" that witness said, "Now there is just three of you left in the family and if you can't get along without an argument over this, it is just too bad. Get along without an argument or fuss over it some way or other;" that they examined all the papers in the box, and after all the papers were taken out, appellant gave them a shove and said, "There you are. I am cut off without a damn cent except the place. I am not going to cause no trouble. That is the will and there you are, sis, you and Frank have got it all;" that Mrs. Thomas said, "Well, now, I have got a pocketbook here that was on dad's person with some money in it. To do what's part way right, I am willing to divide this and when dividing it, divide it four ways. We will take out one share for Raleigh. We will take one-fourth of this for Raleigh, this money that we found on dad's person;" that the money was then divided, and Mrs. Thomas

was to hold Raleigh's share. On cross-examination he testified that there was no discussion of the division of anything other than the money.

The above is substantially all of the evidence of all of the parties present on February 5, 1939, as to what occurred on that occasion, at which time it is claimed by appellant that the agreement was made. There is considerable additional evidence in the record as to the subsequent conduct of the parties and as to matters occurring after February 5, 1939, from which counsel for appellant argue and attempt to draw the inference that such an agreement was entered into, and which counsel for appellees, on the other hand, argue and contend support their denial of the same.

The rule is well established, as appellant claims, that courts of equity look favorably upon the settlement of disputes among members of a family by agreement, and will readily interpose for its specific performance unless there is some insuperable bar to prevent. However, all of the cases cited by appellant upon this proposition do not depart from the established rule that such contracts, as well as all other contracts require as an essential element of their validity a sufficient consideration. The disputes between rival claimants to an estate are fair subjects of compromise and settlement, and the mutual concessions of the parties for the prevention of litigation afford a valid consideration for the agreement. And such a consideration is not only sufficient, but is looked upon with great favor in a court of equity, and will be enforced. It goes without saying, however, that there must be some reasonable or substantial basis for the claims advanced by the parties which are surrendered by the agreement. The case of *Hall* v. *Hall*, 125 Ill. 95, cited by appellant, was based upon a written contract providing for the distribution of the estate and the settlement of disputed items of indebtedness between certain of the heirs. In this case, the court said on page 101 of the opinion: "The written agreement of January 19 is plain, clear, and full. It bears upon its face evidence of

ample consideration, and is of itself a complete contract." In the case of *Cole* v. *Cole*, 292 Ill. 154, also cited by appellant, the court in upholding the validity of a family-settlement contract said: "The fact that some of the heirs had filed a bill to set aside the will and that they reasonably believed they had a right to have it set aside, which right they gave up by the contract in question, constitutes a valid consideration for such a contract." (*Pool* v. *Docker*, 92 Ill. 501; *Honeyman* v. *Jarvis*, 79 id. 318.) The case of *Wolf* v. *Uhlemann*, 325 Ill. 165, upon which appellant also relies, was based upon a written agreement entered into after a suit had been filed to set aside a will, and where the will itself was so involved and complicated, and its provisions so uncertain in legal meaning that the parties beneficially interested in the estate might well doubt what their rights were under the will, and its ambiguity would justify them in seeking to have the will construed. All these considerations led to the making of the compromise family settlement, which this court approved, saying: "Where there is a reasonable or substantial basis for the belief or assurance that prolonged and expensive litigation will result over the proceeds or distribution of an estate, that the estate will be materially depleted and that the family relationship will be torn asunder, the parties interested therein are warranted in preventing such a *bona fide* family controversy by a settlement agreement." In the case of *Jennings* v. *Hills*, 247 Ill. App. 98, cited by appellant, there was a pending contest over the validity of the will, and also family disputes and differences, and a bargain or compromise agreement was made between all the beneficiaries of the will, whereby a decree should be entered sustaining the will and certain beneficiaries should receive money in consideration of their releasing all their rights and interests in the estate.

Appellant sets up in his complaint, on information and belief, that he could have defeated probate of the will or successfully contested the same in chancery on the ground

of undue influence and mental incapacity, so that the property of Robert Anderson would have descended as intestate property and appellant would have received one fourth thereof, and alleges that he refrained from taking such action, relying upon said alleged agreement between appellees and himself. This is the consideration upon which appellant bases his alleged contract. We have examined the record and the evidence, and find the same shows a total absence of such belief, if such there was, at any time being communicated by him to or urged upon the appellees. He himself testified fully as to all that was said and done at the time the will was read. He also stated on cross-examination that he had testified to practically all conversations had with appellees in regard to the estate, except perhaps some little details. In none of these conversations, either as testified to by him or by any one else, or in any of the evidence was there the slightest intimation or suggestion of the invalidity of the will, of any undue influence or mental incapacity or of any claim made by appellant to that effect. An examination of the record leads to the conclusion that he believed that he could not and, in view of the ninth or *in terrorem* clause of the will, dared not oppose its admission to probate or file any contest of its validity. In none of the cases cited by appellant is the factual situation similar to that in the case at bar. If litigation had been threatened by appellant, or could reasonably have been anticipated, or if there had been any ambiguity in the will as to appellant's interest in the estate, the situation would then be different. It is in such cases that equity looks favorably upon family settlement contracts and readily lends itself to the specific enforcement thereof.

Invoking the doctrine of estoppel, appellant argues that the making of the contract is established by the testimony of Mrs. Thomas that on February 5, after she suggested that the money or contents of the box be divided into four parts, appellant said if that was to be done, then he would

sell the house and they sell the farm and pool the money and divide everything four ways, to which Frank said nothing, and she replied, "We'll wait on that," or "Not for a while." Appellant insists that her answer clearly showed her assent to the suggestion but her insistence upon delay for the actual division until a later time, and that he had a right to assume from her answer and the silence of Frank, that they had accepted his proposition. On the other hand, we think it might perhaps be assumed that her reply was a postponement of any decision on the matter. The law is well settled that a court of equity will not decree specific performance of a contract the existence of which depends upon parol testimony unless the proof is clear and conclusive of its existence and terms. In such case the evidence must be clear and explicit, leaving no room for reasonable doubt, and the contract and all of its terms clearly proven. (*Mould* v. *Rohm,* 274 Ill. 547, 555; *Reynolds* v. *Wetzler,* 254 id. 607; *Davier* v. *Kaiser,* 280 id. 334, 341; *Garren* v. *Shook,* 306 id. 154; *Olson* v. *Forsberg,* 332 id. 266, 271-272; *Williams* v. *Corcoran,* 346 id. 105, 106-107.) The proof upon which specific performance of a parol contract is asked must be established so convincingly that it will leave no reasonable doubt in the mind of the court. (*Williams* v. *Corcoran, supra; Adkins* v. *Adkins,* 332 Ill. 422; *Joseph* v. *Evans,* 338 id. 11; *Stephens* v. *Collison,* 313 id. 365; *Anderson* v. *Augustana College,* 300 id. 72; *Crawley* v. *Howe,* 291 id. 107; *Weir* v. *Weir,* 287 id. 495; *Davier* v. *Kaiser, supra; Mould* v. *Rohm, supra; Reynolds* v. *Wetzler, supra.*) Upon a careful examination of the entire record we are compelled to hold that the proof is not such as is required to establish a valid and enforceable contract upon which to base a decree for specific performance. Therefore that part of the decree appealed from is correct and will be affirmed.

*Decree affirmed.*