(No. 28331.—

AURELIA RIGOLIO, Appellee, *vs.* FRANK A. KNOPF, SR., *et al.,* Appellants.

*Opinion filed March 21, 1945—Rehearing denied May 21, 1945.*

FRANK H. KLAAS, and PHILIP A. GIBBONS, both of Chicago, for appellants.

HUBBARD, BAKER & RICE, (ALVIN GLEN HUBBARD, of counsel,) both of Chicago, for appellee.

Mr. CHIEF JUSTICE FULTON delivered the opinion of the court:

Aurelia Rigolio filed a complaint in the superior court of Cook county against Frank A. Knopf, Sr., individually and as executor of the estate of Fred C. Schoepf, and Elsie Knopf Burgess, seeking specific performance of an alleged oral contract between Fred C. Schoepf and the plaintiff, whereby the former, in consideration of the care and services to be rendered by the appellee, Aurelia Rigolio, to Schoepf during his lifetime, would leave all of his property to the plaintiff. It is. alleged in the complaint that Aurelio Rigolio performed her part of the contract, but upon the death of Fred C. Schoepf no provision was made for the transfer of any property to the appellee. The prayer of the complaint is that the title to all of the real estate of which Fred C. Schoepf died seized and possessed be found in the plaintiff and that the defendants be required to account for all of the personal property belonging to Fred C. Schoepf at the time of his decease, together with general equitable relief. In this opinion the appellee, for the sake of convenience, will be designated as "plaintiff" and the appellants as "defendants."

All of the defendants filed answers denying that the plaintiff is entitled to any of the relief prayed for in her complaint. A separate defense averred in the answer is that the purported agreement was not in writing according to the form of the statute.

The cause was referred to a master in chancery for the purpose of taking the proofs and reporting the same, together with his findings of fact and conclusions of law. In his report the master found in favor of the plaintiff

and recommended a decree in accordance with the prayer of the complaint. The court approved and confirmed the master's report and entered a decree for the plaintiff. The defendants have prosecuted this appeal.

Fred C. Schoepf, a bachelor, for some years prior to 1926 lived with his sister, Sophie Schoepf, at 2123 Roosevelt road in Chicago. They occupied the top apartment of a three-story building which was owned by the said Fred C. Schoepf. On March 22, 1926, the said Sophie Schoepf died. For years and up until her death she kept house for her brother, preparing his meals, doing his washing and doing necessary work in the apartment.

The said Fred C. Schoepf continued to live alone in the same apartment until his death on March 17, 1942. He left a last will and testament dated July 10, 1931, wherein Frank A. Knopf, Sr., a nephew, and Elsie Knopf Burgess, a niece, were his sole legatees and devisees. Frank A. Knopf, Sr. was named therein and later qualified as executor of said will.

Fred C. Schoepf died seized and possessed of five tracts of real estate, all located in the city of Chicago, of the alleged value of $18,000, and of personal property of the value of approximately $5000.

It is the contention of the plaintiff, Aurelia Rigolio, that in the spring of the year 1928, the said Fred C. Schoepf, then 65 years of age, entered into an arrangement with her whereby he agreed to leave her everything he had, at his death, if she would prepare a hot meal for him each day, do his personal washing, clean his apartment and attend him if he became ill. She insists that she accepted the agreement as proposed by Fred C. Schoepf and fully performed the terms of the contract during his lifetime.

In support of the claim that the contract was entered into, plaintiff relies on the testimony of her daughter, Natalia Green, who in the spring of 1928 was thirteen

years of age and present at the time the agreement was made. She testified that after Sophie Schoepf's death, Fred Schoepf started coming to the Rigolio home for his meals and paying for them; that her mother decided Schoepf was not paying enough for his meals and told him he would either have to pay more or quit altogether. Schoepf then proposed to her mother that if she would give him any aid he needed when sick, give him one hot meal per day, wash his personal things, and help him take care of his home, when he died he would see that whatever he had would be left to her. She further testified since that date her mother had furnished Fred Schoepf a dinner every day, 365 days a year. If he was not at her mother's to eat, the witness or her mother took the dinner to him; that they washed Schoepf's personal things; that they attended him when his collarbone was broken; that Schoepf brought his chauffeur, Eddie Berger, to the Rigolio home to eat twice a week and never paid anything for that; that Schoepf never paid her mother anything after the conversation in the spring of 1928 and that they also cleaned up Schoepf's rooms whenever he would let them. The existence of said arrangement or contract and the terms thereof were supported by proof of declarations and admissions made by the said Fred C. Schoepf to various witnesses.

The testimony is voluminous. Eight or ten other witnesses testified with reference to the care and services rendered by Aurelia Rigolio to Fred C. Schoepf, and to repeated conversations with the latter where he reiterated again and again that he had arranged to pay the plaintiff by leaving all of his property to her at the time of his death.

Dr. Michael H. Kyriak, a dentist by profession, had done some work for Schoepf and was also a friend of Mrs. Rigolio. He testified that he met Schoepf first either in 1928 or 1929; met him at the home of plaintiff for dinner

once or twice a year. Fred Schoepf, on several occasions, told him about his arrangement with the plaintiff and the terms of the agreement. Anna Dancy had dinner at plaintiff's house every Saturday and Sunday evening from 1933 to 1941, and Fred Schoepf was there on each occasion. She saw him eating dinner there hundreds of times, and talked to him about his agreement with plaintiff four or five different times, the last occasion being on New Year's Eve, 1941, and the first one in March, 1934. Mary Berg testified that she visited plaintiff's home twice a week in the evening over a period of ten or twelve years. Every time she was there Fred Schoepf was there and had his dinner. He told her two or three different times that plaintiff was performing services for him and that she would get everything he had at his death. Edward A. Berger drove Schoepf's car for him over a period of twenty years. He went to plaintiff's house with Schoepf to eat quite frequently. He discussed with Schoepf his arrangement with the plaintiff for pay at least once each year, from 1928 until his death, the last time being about two weeks before he died. He saw the plaintiff perform all manner of services for Schoepf, who told witness she was to have all of his property at his death. Similar testimony was given by Frances Braja, Jack Braja, Dora Patrick, Joseph Nosek, Charles Conroth and Lawrence Marfise.

The evidence produced by the defendants was in direct conflict. The deceased lived in the third-floor apartment at 2123 Roosevelt road, and Henry and Nicholas Pfeil, two bachelor brothers of advanced years, lived in the second-floor apartment of the same building. They each testified that they had known Fred Schoepf for a great many years and were like companions with him. They spent the winters in Florida since 1938, and summers in Chicago. They were goods friends of Schoepf, saw him nearly every day, visited Schoepf's flat on many evenings to listen to the radio; they testified that Mrs. Smit, living

in the basement apartment, did frequent washings for Schoepf; they moved out of the apartment in 1938, and had never seen or heard of Mrs. Rigolio. Hulda Miller and her son, Irwin Miller, occupied the same second-floor apartment beginning in the summer of 1939. Mrs. Miller testified that she had seen a Mrs. Smit bring down baskets of clothes from Schoepf's apartment; that she saw Schoepf about once a day and talked with him; that he made a practice of sitting on the front porch at the second-floor entrance to the building in the summer evenings and visiting with her and her son. She also testified that she had seen plaintiff going to Schoepf's apartment four or five times. The testimony of Irwin Miller, her son, was much the same. Jenney Goosens testified that her mother, Mrs. Smit, did Fred Schoepf's washing for a good many years.

Frank A. Knopf, Sr., the executor of the Schoepf estate and one of the heirs, testified, when called for cross-examination under section 60 of the Civil Practice Act, that he had been very close to his uncle for the last fifteen years of his life, looking after his business, paying his bills, taking care of his property and matters of that character; also looking after him during his last illness. Several of the Knopf relatives testified to the fact that Fred Schoepf always ate his Christmas, New Year's and Thanksgiving dinners at the home of Frank Knopf, Sr.

One cannot read this long record without being convinced that the plaintiff did perform some service for Fred C. Schoepf during the period from the year 1928 until his death, and particularly in the way of supplying him with his evening meal each day.

The testimony also gives one a definite impression that his relatives failed to keep in close touch with him or to give him any particular attention during the fifteen-year period prior to his death.

The test in this case is whether the testimony measures up to the rules announced by this court in specific per-

formance cases. In *Anderson* v. *Augustana College,* 300 Ill. 72, at page 80, we said: "Contracts which a court of equity will specifically enforce must be fully and completely proved and their terms must be shown with certainty. Courts of equity scrutinize with the most scrupulous care the evidence offered in support of a contract to make a disposition of the property of a deceased person different from that which the law prescribes. (*Sloniger* v. *Sloniger,* 161 Ill. 270; *Woods* v. *Evans,* 113 id. 186.) The proof which will justify a court in decreeing specific performance of a parol contract must be clear and conclusive, and there must be no reasonable doubt that the contract was made and all of its terms clearly proved. (*Mould* v. *Rohm,* 274 Ill. 547; *Reynolds* v. *Wetzler,* 254 id. 607; *White* v. *White,* 241 id. 551.)"

In *Fleming* v. *Dillon,* 370 Ill. 325, being one of the cases upon which the appellee relies, the plaintiff discontinued her employment as a school teacher and remained in the home of one Marshall A. Brown as housekeeper. She quit teaching in 1919, and remained with Brown until his death in 1936. She assisted him in his business affairs and gave him additional service during his illness. Most of the bills at the home were paid by the husband of the plaintiff. The testimony of Brown's friends, professional, business and social acquaintances, about thirty in number, showed that he told them he had provided for the plaintiff in his will. In summing up the evidence this court said, "There is nothing to cast doubt upon the credibility of these witnesses and their testimony is practically undisputed." The evidence was conclusive that the contract was made; Mrs. Fleming gave not only her time but her money for the care of Brown to the end of his life and never received any compensation therefor.

It can hardly be said of the testimony in the present case that there is nothing to cast doubt upon the credibility of plaintiff's witnesses or that the testimony is practically

undisputed. In the first place, there is a material conflict in the evidence. Secondly, none of the immediate friends of the decedent testify as to the making of, or the existence of, the contract. In the third place, on July 10, 1931, three years after the date of the alleged contract and after the death of his sister Kate, the deceased made and executed a new will in which he named his nephew and niece, the defendants in this case, as his sole beneficiaries. They were also his only heirs-at-law then surviving. During the entire fourteen-year period, the plaintiff was employed as a lampshade maker at the Shoreland hotel, which necessitated her absence from home from about 7:00 A. M. until about 7:00 P. M.

These are circumstances which tend to cast doubt upon the making and existence of the contract. It is not the same clear, convincing, unambiguous and undisputed proof found in the record of the *Fleming case.*

In almost every case cited by the plaintiff where there was a successful attempt made to specifically enforce similar oral contracts, the record shows that the plaintiff had made unusual sacrifice by leaving home and living in the home of the deceased for a long period before death. In each case the services were open, notorious and satisfactorily proved. *Mayo* v. *Mayo,* 302 Ill. 584; *Willis* v. *Zorger,* 258 Ill. 574; *Dalby* v. *Maxfield,* 244 Ill. 214; *Gladville* v. *McDole,* 247 Ill. 34.

We feel that the evidence in this case is not so convincing and conclusive as to warrant this court in finding that the contract was made and all of its terms clearly proved.

The decree of the superior court of Cook county is reversed and the cause remanded, with directions to dismiss the complaint.

*Reversed and remanded, with directions.*