(No. 14676.—Decree affirmed.)

MYRTLE GARREN *et al.* Defendants in Error, *vs.* ALBERT SHOOK *et al.* Plaintiffs in Error.

*Opinion filed December 19, 1922.*

1. DEEDS—*there is no delivery if a grantor retains control of deeds.* Where a grantor makes deeds to his sons and leaves the deeds with the scrivener under directions to deliver them to the grantees if the grantor does not call for them, there is no delivery of the deeds even though the grantor does not afterwards call for them.

2. EVIDENCE—*when defendants in partition suit may testify in each other's behalf.* Where complainants are suing for partition as heirs of a deceased person, the defendants, who are also heirs of the same ancestor but who have filed cross-bills claiming title to different portions of the land under separate contracts with the ancestor, are incompetent to testify on their own motion or in their own behalf but each defendant may testify in behalf of the others. (*Linn* v. *Linn,* 261 Ill. 606, distinguished.)

3. SPECIFIC PERFORMANCE—*evidence of a contract disposing of property of deceased person will be carefully scrutinized.* Courts of equity look with jealousy upon evidence offered in support of a contract to make a disposition of the property of a deceased person different from that provided by law and will weigh such evidence in the most scrupulous manner.

4. SAME—*parol evidence of a contract to convey must be clear and conclusive.* The proof which will justify a court of equity in decreeing the specific performance of a contract for a conveyance, the existence of which depends upon parol testimony, must be clear

and conclusive, and there must be no reasonable doubt that the contract was made and that all its terms have been clearly proved.

5. SAME—*a contract between a parent and child must be more clearly proved than between strangers—presumption.* The nature of the relation which exists between a parent and child requires a contract between them to be proved by a different kind of evidence from that which is sufficient as between strangers, and in case of an alleged contract for a conveyance from father to son, where the father has put the son in possession, there is a presumption that the use and possession are permissive.

6. SAME—*when contracts for conveyances from father to sons are not established.* Parol contracts for conveyances of different portions of a farm from the owner to his sons are not sufficiently established by evidence of statements of the father, at different times, of his intention to give the land to his sons, as such language is not the binding language of a contract but rather the language of voluntary donation, and the use and possession of the different portions claimed by the sons cannot be attributed to the alleged contracts.

WRIT OF ERROR to the Circuit Court of Marion county; the Hon. THOMAS M. JETT, Judge, presiding.

C. F. DEW, and ELBERT B. VANDERVORT, for plaintiffs in error.

WHAM & WHAM, for defendants in error.

Mr. JUSTICE DUNN delivered the opinion of the court:

Samuel Shook died on April 4, 1920, leaving his daughter and four sons his only heirs and leaving no widow. In his lifetime he had owned 231 acres of land in Marion county, upon which he lived, and soon after his death his daughter, Myrtle Garren, and Melvin W. Shook, one of his sons, filed a bill in the circuit court of Marion county against the other three sons, Albert, Frank and Elmer, for the partition of the land, the quieting of the title to it, and the setting aside of two warranty deeds to Frank and Elmer for portions of the land, which had been recorded after Samuel Shook's death. The three defendants named answered the bill, alleging that on July 15, 1919, Samuel

Shook had executed a deed for 60 acres of the land to El-
mer and for 61 acres to Frank in pursuance of contracts
which he had entered into with them on February 20, 1916,
and on February 1, 1915, respectively, whereby he agreed
to convey the land to them if they would take possession
and make certain improvements.   The answer also averred
a similar contract between Samuel Shook and Albert Shook
with reference to another portion of the land consisting of
50 acres, of which no conveyance had been made.   It was
alleged that all the contracts had been completely per-
formed by the defendants, respectively, and that they were
entitled to have the respective tracts of land conveyed to
them.   Each of the defendants filed a cross-bill setting up
his contract as alleged in the answer and alleging complete
performance of it on his part.   The cross-bills of Frank and
Elmer allege that Samuel Shook executed the deeds to them
dated July 15, 1919, and delivered them to S. B. Warren
in escrow, to be delivered to the respective grantees upon
the death of the grantor; that Warren accepted the deeds
and after the death of the grantor had them recorded and
delivered them to the grantees.   The complainants in these
two cross-bills prayed that they might be declared to be
the owners in fee simple of the premises described in the
deeds, and in the alternative, if the deeds should be de-
clared of no effect, that they might be decreed a specific
performance of their contracts.   Albert's cross-bill prayed
for a specific performance of his contract with Samuel
Shook. ＾ The cause was heard in open court and a decree
was rendered dismissing the cross-bills, quieting the title
and ordering partition of the whole 231 acres of land.

The deeds executed on July 15, 1919, were not deliv-
ered.   S. B. Warren, who was a police magistrate in Cen-
tralia, prepared the deeds at the request of the grantor.
His sons, Frank and Elmer, the grantees, were present, but
the deeds were not delivered to them.   Warren testified
that the grantor signed and acknowledged them and said

to Warren that he would leave the deeds there, and if he did not call for them Warren should deliver them to the boys. The grantor did not afterwards call for the deeds. The grantor thus retained control of the deeds and had a right to call for them at any time, and there was therefore no delivery of them. *Mosier* v. *Osborn,* 284 Ill. 141; *Johnson* v. *Fleming,* 301 id. 139.

Each of the cross-complainants was produced as a witness and testified in behalf of the other two. The complainants objected to their competency on the ground of their interest. The statute prohibits any party to a suit or person directly interested in the event thereof from testifying therein of his own motion or in his own behalf when any adverse party sues or defends as the heir of a deceased person, and therefore the defendants were incompetent to testify on their own motion or in their own behalf. In *Linn* v. *Linn,* 261 Ill. 606, it was held in a partition suit that two of the defendants who were offered to testify to transactions and statements of the complainant's ancestor previous to his death, showing a symbolical delivery to them of deeds under which they claimed adversely to the heirs, were incompetent to testify in their own behalf, and that neither was competent to testify in favor of the other as to those transactions and statements. That case, however, is to be distinguished from this by the fact that both of the parties were claiming under precisely the same transactions, and that it was impossible for either to testify in behalf of his co-defendant without testifying at the same time in his own behalf. In this case the parties were claiming under separate and independent contracts. The testimony of any one of them as to the contracts made with his co-defendants would have no effect whatever in his own behalf. The connection of the three of them in one suit could not affect the competency of the evidence by which they were to be proved, whatever might be its effect on the credibility of the witnesses in weighing their testimony.

Frank Shook testified that his father told Elmer to go ahead and improve the ground,—put in trees; that he would give him that land to improve it. He told him that more than one time. Elmer took charge of the land five years ago. He farmed it and planted peach trees on it. The trees would be five years old in March after Frank testified. He made other improvements on the place and kept up the fences and has farmed it from that time since. His father also said for his brother Albert to have that for a home place; to go ahead and improve it,—the place where he now lives. Albert put a house of three rooms on the place and built a barn. He put out about 300 peach trees and 100 pear trees on the place and made other improvements He lived on the place twenty or twenty-one years.

Albert Shook testified that he heard his father tell Elmer he would give him 60 acres if he would go to work and improve it. He pointed out the 60 acres. Elmer put out peach trees and kept up the fences and farmed the place from that time on. His father told Albert that he meant to give Frank the home place,—the 41 acres and the 20 acres east of Albert; for him to go to work and improve it. His brother went to work and improved it. He put out a peach orchard, fixed up the barn a little and built a silo. He set out about 20 acres of peach orchard on the place about four years ago,—the spring before Albert testified. He lived on that place, stayed with his father and lived there about forty-five years.

Elmer Shook testified that he heard both his father and mother tell Albert several times about the improvements on the place where he lived. They told him to stay there and improve the land; that it was his. He then stayed on it. He built a house and built a barn and put out peach trees.

William S. Skipper testified that he knew Samuel Shook, and when he was out there one day on the front porch Samuel asked him if he had seen the boys' peach orchard, and said, "When you come back you can drive right through

with your car; they have got a roadway between the two orchards." Samuel said: "It is mighty fine,—as fine an orchard as you ever looked at." He told Skipper that belonged to Elmer and Frank, and said: "I am going to make deeds to this; they put this orchard out, and I told them to put it out and I would give them a deed to the land." He said he was going to give Albert the place he lived on; that Albert had been living there right at twenty years now, and he told Albert he would deed it to him when he got an abstract for it. He said he was going to give Frank the home place because he had taken care of him for several years when the others had left.

Emma Skipper testified that she heard Samuel Shook say that he was afraid he was going to die in one of his bad sick spells and he wanted to get his business fixed up and wanted Frank to have the home place; that he had always stayed there and took care of him. She heard him speak quite a number of times about the boys' peach orchard.

Jackson Peoples testified that he heard Samuel Shook say he was going to give Frank the homestead there and the 20 where his peach orchard is, and he said he would give Elmer the 40 east of the old home and the 20 where his peach orchard is; that he was going to give Myrtle Garren 50 acres over where the timber is and Albert the 40 acres where he lives. He never heard Samuel say anything about the work the boys had done on the place. He said the boys paid for those peach trees on their places but he paid for Albert's trees.

George Allen testified that he had known Samuel Shook and his sons for two years; that each of the boys was in control of a portion of the land during the time he knew them. Allen told Samuel that Elmer had given him some timber up there by his peach orchard,—four big ash trees,— and Samuel said: "I don't believe you can split it; Elmer has got a lot of wood he ought to get cut down; they will

ruin his trees." He said the boys were getting a nice peach orchard out there if they would take care of it.

Lula Flick, who was twenty-three years old, testified that she was the grand-daughter of Samuel Shook, and that her grandfather told her father, Albert, to go ahead and improve up the place and he would give him the 60 where he lived. He told him several times,—she could not tell the exact time. He said he was going to deed Elmer and Frank the 60 acres that had the peach orchard on it. They set the trees out there. She had lived on the land claimed by her father all her life. Her father built the house and barn and a few other little buildings and built the fences. There are 40 acres in that place of her father's, right on the place, and across there are 20 acres,—60 acres. He said the same thing about Elmer and the land. Frank lived at the home place. He did not have any children. Her father had nine children and she was the oldest.

Aaron Shook, Albert's son, nineteen years old, testified that he heard his grandfather say he was going to give his father that place where he lived about three years ago. His father had put up a barn on the land and put out a peach orchard,—about five acres. At the time he put out the peach orchard Samuel Shook said for him to put out the orchard; that he would let him have that. Then Albert put it out. Samuel also told Frank if he would put out the orchard he would deed him that, and Frank put the orchard out. He said the same thing to Elmer, and Elmer put out 20 acres.

Mrs. Zina Shook, Albert's wife, testified that Samuel Shook said years ago, before they put this peach orchard out, for Elmer and Frank to go ahead and improve the land; that he would deed the land to them, and he did so.

Ethel Shook, sixteen years old, testified that her grandfather said for her father, Albert Shook, to go ahead and put out his peach orchard; that that land was his, and her father set out the peach orchard. She heard him say for

Frank to go ahead and set out his peach orchard; that was his; and to Elmer for him to go ahead and put out his peach orchard; that land was his. Her father lived on the land claimed by him then, and had as long as she could remember. Elmer lived on and had control of the 20 acres of peach orchard.

Fred Kruse, Elmer's father-in-law, testified, in substance, that about four years before, Elmer wanted to go to South Dakota, but Samuel offered to give him 20 acres to put in an orchard, clean it and put up fences. The east 40 acres of bottom land was the land he promised Elmer, east from Samuel's place.

This is all the testimony having any tendency to show an agreement by Samuel Shook to convey the land to any of his sons. The house which Albert built upon the land which he claims in 1901 and 1902, was a two or three-room house, 16 by 28 or 30 feet in size. Frank was never married and lived on the home place with his father all his life. Elmer also lived on the land which he occupied for many years. Samuel had a pension of $50 a month the last ten or twelve years of his life and before that a pension of $30 a month. Elmer, Frank and Albert paid no taxes but they were paid by their father. Albert is about fifty years old, Frank forty-three and Elmer forty-two.

Courts of equity look with jealousy upon the evidence offered in support of a contract to make a disposition of the property of a deceased person different from that provided by law and will weigh such evidence in the most scrupulous manner. (*Sloniger* v. *Sloniger,* 161 Ill. 270; *Woods* v. *Evans,* 113 id. 186.) The proof which will justify a court of equity in decreeing the specific performance of a contract the existence of which depends upon parol testimony must be clear and conclusive, and there must be no reasonable doubt that the contract was made and that all its terms have been clearly proved. (*Mould* v. *Rohm,* 274 Ill. 547; *Reynolds* v. *Wetzler,* 254 id. 607; *White* v.

*White,* 241 id. 551; *Davier* v. *Kaiser,* 280 id. 334.) The nature of the relation which exists between a parent and child requires a contract between them to be proved by a different kind of evidence from that which is sufficient as between strangers. This court in *Geer* v. *Goudy,* 174 Ill. 514, quoted with approval the following language used by the Supreme Court of Pennsylvania in *Poorman* v. *Kilgore,* 26 Pa. St. 365: "It is so usual and natural for parents to help their children by giving them the use of a farm or house and then call it theirs, that no gift or sale of the property can be inferred from such circumstances. It is so entirely usual to call certain books, or utensils or rooms or houses, by the name of the children who use them, that it is no evidence at all of their title as against their parents, but only a mode of distinguishing the rights which the parents have allotted to their children as against each other and in subjection to their own paramount right." The court further says: "The fact that a father puts his son in possession of land with the expectation of giving it to him some day is not conclusive evidence of a gift of the land. (*Cox* v. *Cox,* 26 Pa. St. 375.) It is the presumption in all such cases that the use and possession are permissive. The ownership is that of the parent, who simply permits or suffers the use and possession by the child. (*Erie and W. Co.* v. *Knowles,* 117 Pa. St. 77.) In *Harrison* v. *Harrison,* 36 W. Va. 556, it was said: 'Neither are loose declarations of the father calling the land the son's property, without explanation, sufficient evidence of a gift. A contract between father and child, from the nature of the relation, requires to be proved by a kind of evidence very different from that which might be sufficient between strangers. The evidence in such case of a parol gift from father to child should be direct, positive, express and unambiguous and its terms clearly defined.' "

The testimony shows that for many years Samuel Shook had permitted his sons to occupy portions of his farm; that

he spoke of the parts which they respectively occupied as being his sons', both to his sons and to others. But the statements of the testator testified to are just as consistent with an intention to make a gift of the respective pieces of property to his sons as with a contract binding him to do so. The language is not the binding language of a contract but rather the language of voluntary donation.

The testimony as to the terms of any agreement between Samuel Shook and any one of his sons is of the vaguest character. It is given by the witnesses in the most general terms, without reference to dates or circumstances, and usually applies in the same terms to the cases of all three. It consists for the most part of casual conversations with ordinary acquaintances, referring to the intentions of the father as to the distribution of his property among his children. The only testimony which supports in any degree the claim of a contract is that of the sons themselves and the members of Albert's family, and even this testimony lacks the certainty and precision required to justify a decree enforcing an oral contract to convey land against the heirs of a deceased person. Frank's statement, for instance, is that his father told Elmer to go ahead and improve the ground,— put in trees; that he would give him that land to improve it; that he told him that more than one time; that Elmer took charge of the land five years ago; that he farmed it and planted peach trees on it; that the trees would be five years old in March. This statement, either by itself or in connection with the other evidence, is too vague to establish any contract. It fails to identify any land. It refers to the peach orchard, but the evidence does not identify the peach orchard. Elmer claims 60 acres, but the 60 acres are not identified. The statement that Elmer took charge of the land five years ago does not prove that Elmer did anything. He planted peach trees on the land and farmed it. The other evidence shows that Elmer was farming the land long before the peach orchard was set out, so that his pos-

session, such as it was, could not be attributed to the supposed contract.

Frank's testimony about Albert's claim was, that his father said for Albert to go ahead and improve the place where he now lives and have it for a home. Albert put a house of three rooms on the place and built a barn. He put out about 300 peach trees and 100 pear trees on the place and made other improvements. He lived on the place twenty or twenty-one years. This is as vague as the testimony in regard to Elmer, or more so. Other evidence shows that Albert built the house in 1901 or 1902, but neither Frank's testimony nor other evidence shows when his father made this statement, or that it was made to Albert or even in his presence, or when, if at all, Albert took possession of the land. The peach orchards have added materially to the value of the land, the 35 acres with the five-year-old orchards, according to the testimony, being worth $400 or more an acre. There is no evidence as to any one of the sons taking possession of the land he claims under the supposed contract with his father for setting out the peach orchards. All were in possession of the parts of the farm they respectively occupied, long before the peach orchards were set out.

The testimony, taken all together, is equally vague with that which has been referred to. Samuel Shook paid the taxes on the whole farm during his lifetime and paid for the insurance on the buildings, including the house and barn which Albert built. From a consideration of all the evidence contained in this record we are convinced that the chancellor who heard all the witnesses in open court was right in his conclusion that the contracts set up in the cross-bills were not proved by clear and satisfactory evidence with the degree of certainty required in cases of this character.

The decree will be affirmed.

*Decree affirmed.*