211 P.2d 769

JOHNSON et al. v. FLATNESS et al.

No. 7575.

Supreme Court of Idaho.

Nov. 8, 1949.

Rehearing Denied Dec. 7, 1949.

38

Estes & Felton, Moscow, for appellants.

J. H. Felton, Lewiston, William J. Jones, Lewiston, for respondents.

KEETON, Justice.

This is a suit to compel specific performance of an alleged oral contract to will land and personal property and impress the same

with a trust. The cause was tried before the court without a jury on the 31st of May, 1949, and findings of facts and conclusions of law and decree were entered in favor of the plaintiffs (respondents here). Defendants appealed from the judgment.

The testimony discloses that about 1900 R. J. Johnson and his first wife, Gunhilda Johnson, acquired certain farm lands near Troy, Idaho. To them were born five children, namely, Anna Bovencamp, Olga Stredwick, Regina Dahlberg, Gunhilda Olson and John R. Johnson, respondents here. Gunhilda Johnson died on the 2nd day of February, 1908, and at that time the parties owned 160 acres of land and some personal property, admittedly the community property of R. J. Johnson and his deceased wife. In 1917 R. J. Johnson married Kristiane Flatness and during this marriage other lands and personal property were acquired. R. J. Johnson died the 6th day of March, 1942, intestate.

During the probate proceedings of the R. J. Johnson estate, a family dispute arose as to the rights of the children by the first wife, and the widow Kristiane Johnson. A meeting of the family was had in Moscow, Idaho, on September 12, 1942, at which the only person present, outside of the family, was Ernest Bovencamp, husband of Anna. After some discussion of the conflicting claims, the parties, together with Kristiane Johnson, went to the office of Mr. Laurence Huff, where a further conversation took place, and an agreement was made that the children of R. J. Johnson by his first wife, respondents here, would withdraw objections to the settling of the R. J. Johnson estate by an exchange of deeds covering 160 acres of land admittedly his separate property. Pursuant to said agreement deeds were prepared by Mr. Huff in which the land owned by R. J. Johnson and his first wife, Gunhilda Johnson, was deeded to Kristiane Johnson, and she in turn deeded the property back to respondents, reserving herself a life estate. A decree of distribution of the R. J. Johnson estate was thereafter made; the property described in the above mentioned deeds was distributed to respondents, giving the widow a life estate as provided for in the deeds above mentioned.

Other property was decreed to be the community property of the deceased and his second wife, Kristiane Johnson, and was distributed to her. The property thus distributed to Kristiane Johnson, as community property, is the subject matter of this action, there being no dispute regarding the title to the 160 acres described in the deeds and referred to in the briefs as the "Home Place".

Kristiane Johnson died intestate on the 6th of June, 1948. Her sister, Karen Flatness, applied for and was granted letters of administration. The petition alleged the heirs to be Andrew Flatness, Halvor Flatness, and herself.

The children of R. J. Johnson by his first wife then brought this action for specific

performance of an alleged oral contract of Kristiane Johnson to will to them all the property upon her death.

The court found that such a contract was made, and decreed that Kristiane Johnson had contracted to make a will giving respondents all of her estate equally and that such contract should be specifically performed by Karen Flatness, administratrix of the estate of Kristiane Johnson, deceased, and by the decree disinherited the appellants, brothers and sister of Kristiane Johnson.

At the trial Regina Dahlberg, John R. Johnson and Gunhilda Olson, parties plaintiff, were permitted to testify, over appellants' objection, relative to facts occurring prior to the death of Kristiane Johnson. Appellants assign admission of such testimony as error.

Sec. 9-202, I.C. provides:

"The following persons cannot be witnesses:

1. * * *.

2. * * *.

3. Parties or assignors of parties to an action or proceeding, or persons in whose behalf an action or proceeding is prosecuted against an executor or administrator, upon a claim or demand against the estate of a deceased person, as to any matter of fact occurring before the death of such deceased person."

■ That this suit is a claim or demand against the estate of a deceased person cannot be seriously questioned. See Thurston v. Holden, 45 Idaho 724, 265 P. 697; Rice v. Rigley, 7 Idaho 115, 61 P. 290.

The respondents, Regina Dahlberg, John R. Johnson and Gunhilda Olson, related a conversation had with the deceased at Moscow, on the morning of September 12, 1942, and testified to other facts occurring prior to the death of Kristiane Johnson.

No material fact occurring after the death of the deceased was testified to by any of said witnesses.

No citation of authority to interpret Sec. 9-202, I.C. is necessary. Its provisions are positive, plain and mandatory. The objection of appellants was timely and well taken as to all of said testimony and should have been sustained.

■ The appellants assign as error the admission in evidence, over objections, of plaintiffs' exhibit No. 2. This is copy of a letter written to Anna Bovencamp by Laurence Huff, in which he relates that he had a conversation with a Mr. Nelson concerning a will of Mrs. Johnson. The letter was not the best evidence it was heresay, and had no bearing on the issues. The letter was in no wise connected with any act permitted or authorized by Kristiane Johnson. The objection of appellants should have been sustained.

Respondents contend that even though this testimony was inadmissible, it was cured by the findings of the trial court that the testimony of Ernest Bovencamp and

Laurence E. Huff, and the documentary evidence introduced was sufficiently clear and convincing to support the decision, making it unnecessary for the court to consider testimony of John R. Johnson, Regina Dahlberg and Gunhilda Olson.

Ernest Bovencamp is the husband of Anna Bovencamp, one of the plaintiffs, and he testified relative to a conversation had in the police station at Moscow above referred to, and to some occurrences alleged to have taken place in the office of Mr. Huff (Mr. Huff, however, testified that the witness was not present in his office.)

Regarding the making of the will the witness testified as follows:

"Q. Tell the court as best you can what happened there, will you? What was said and done there. A. Well, there was—I don't know. There was a disagreement between the family and Kristiane and they was talking about it and she says, 'Why can't we settle this without any more trouble?'

    *    *    *    *    *    *

"A. And she says, 'Pappy,' she called him, R. J. Johnson, 'would want these things, this matter in that way.' If they couldn't settle the same way, that she wanted to have it that way.

By Mr. Felton:

"Q. Did she name the terms of the settlement? A. She brought the names up.

"Q. I mean, did she name what the terms of the settlement would be? A. Yes.

"Q. And what were they? A. If they would leave her with the place the rest of her time as he had done before, which he would want her to do, she would deed the place back to them children.

"Q. And what would happen to the rest of the property? A. Well, that included all the property.

"Q. Did she say anything about a will? A. Yes. She—

"Q. And what did she say about the will? A. She would will the place.

"Q. To whom? A. To the children.

"Q. And the children that were whose children? A. R. K. Johnson's.

"Q. Now, in what language did that discussion take place? A. Partly in American and partly in Norwegian.

"Q. Could you understand Norwegian at that time? A. I could understand the biggest part of it,

"Q. And what did the children say to such proposal? A. They agreed.

    *    *    *    *    *    *

"Q. What did Kristiane Johnson tell the attorneys to do there? A. She wanted these papers drawn up.

"Q. Did she tell them that? A. Yes.

"Q. Go ahead and tell what she told them. A. If they would let her live there the rest of her life that she would *deed* the places back to the children at her death.

"Q. Did the lawyers get together and draw up some papers? A. They did get together and draw up some papers.

"Q. Was there supposed to be a will? A. There was supposed to be a will.

"Q. Who drew the papers? A. Adrian Nelson.

      \*    \*    \*    \*    \*    \*

"Q. What did she say for him to do? (No Answer.)

"Q. Did she direct Adrian Nelson to draw any sort of a paper? A. Yes, she did.

"Q. What paper did she tell him to draw? A. *Contract.*

"Q. Any other papers? A. *I don't remember.*

"Q. Do you remember whether or not she directed anybody to draw a will? A. Yes, she did that." (Emphasis supplied.)

Mr. Huff testified that there was a meeting or meetings held in his office and at one of the meeting Kristiane Johnson was present. He also testified there was a prior meeting at which she was not present, and pursuant to questions asked by Mr. Felton, he testified:

"Q. All right, let's take the meeting at which she was present. A. As I remember those present at that meeting, it was Kristiane Johnson, John R. Johnson, Anna Bovencamp, Olga Stredwick, Regina Dahlberg, Gunhilda Olson.

"Q. Was another attorney present? A. On that matter, Mr. Felton, my memory is not entirely clear, but if I am permitted to say, I am fairly certain an attorney was present during the latter part of the meeting.

"Q. Who was that attorney? A. Adrian Nelson.

"Q. Do you know the nationality of Adrian Nelson? A. No.

"Q. Do you know whether he could talk Scandinavian, or not? A. Well, the Scandinavian language—he could talk some of those languages.

"Q. These people came in there. What was the purpose of this meeting at your office then? The one we are talking about, where Kristiane was present. A. It was in connection with the hearing concerning the administration of the estate of Gunhilda Johnson which had been held earlier on that day in the probate court in connection with matters arising out of that hearing, the controversy which was in that hearing.

"Q. Tell the court what happened there. A. It's a little difficult without the preliminary conversation held at the earlier meeting. I think you also appreciate it's very difficult to remember the exact words and phrases of the entire conversation and all the things said and also taking into consideration that this meeting may have lasted over—from an hour to maybe an hour and a half, but the time these people came back to the office—

Mr. Estes: "Can you establish about the time, Mr. Huff?

"A. Well, It's a little hard, Mr. Estes. It was the latter part of the afternoon. As I say, maybe around, oh, it might have been around three o'clock, something like that. Maybe 2:30, something like that.

"A. (continuing) But, as I remember it, I said to Mrs. Kristiane Johnson, 'It is my understanding that you and the children have arrived at some agreement in regard to settlement or in regard to the controversy we had this morning in the probate court'. After I made that address, Mrs. Johnson, as I remember, spoke rather broken English. The conversation with her, as I remember it, my memory is that she said words to the effect that that was right. Then it is my memory that I said, 'As I understand it, you are the children on this controversy this morning. You're to have the property as long as you live, and you are to make a will willing all your property to the children when you die'. And my memory is that she said words and phrases that that was right. That was about the size of the conversation to that extent at that place.

"Then my memory is, 'All right, let's draw this will'. As I remember, Mrs. Dahlberg said, 'Adrian Nelson is going to draw this will'. I'm sure Adrian Nelson was not in the office at that time. I rather insisted if this is unusual, they proceed to draw the will right then and there, and there was a continued request that Mr. Nelson draw the will.

"*As I remember, I explained to them that that was a very indefinite situation, and that the making of a will would not necessarily accomplish the desired purpose. A will could be revoked. That unless this will were made as a contractual will, that unless it contain a provision to prohibit revocation, that the will could be revoked; and even though a will were made as a contractual will and contain a provision against revocation, it would not prohibit the owner of the property from transferring the property, that the owner of the property could sell the property to any person if they wanted and the will would then attach to the proceeds if any were left. If the owner gave the property away in the hands of the purchaser, donee, the donee would have the property, but the other thing was altogether unsatsifactory, and also that in view of the records, with this action of record, that a question could be raised as to the title to this property. And then I rather insisted that something be cleaned up as to this particular piece of property, which goes back to a conversation, which I am not prepared to give, with two clients earlier in the morning at the earlier hearing.*

"*I then suggested as far as this piece of property was concerned as to this situation, it would seem to me the proper thing to do was to have the children deed this piece of*

*property to the mother—I mean the step-mother—and the stepmother give a deed back, reserving a life estate 'in herself, and that to that extent was agreed upon and I proceeded to draw these instruments."* (Emphasis supplied.)

On cross-examination: "A. As I remember it, I suggested we go ahead and draw the will. As I remember it, Mrs. Dahlberg spoke up and said words to the effect that Adrian Nelson was going to draw the will, and in testifying this morning the question wasn't asked. I believe anyhow I made the remark and stated to the effect that, 'Let's get Adrian Nelson over here and draw the will'. The objection was made with reference to drawing the will, and then this other conversation with respect to the will.

"Q. And then after you had suggested that Adrian Nelson come over and you draw the will and there was an objection to that, then you went ahead and discussed the proposition of drawing these deeds to be exchanged between the parties, is that right? A. I did.

\*   \*   \*   \*   \*   \*

"Q. I hand you Defendants' Exhibits A and B for identification. Are those the deeds which were prepared that day? A. They were.

"Q. After you quit talking about any will, these deeds were prepared—they were discussed and prepared, is that correct? A. That's true.

"Q. Was there ever any more talk or conversation about any will after these deeds were prepared? A. I have no present independent recollection of any further conversation about making a will.

"Q. Was there actually any will prepared that day that you know of? A. Not in my office.

"Q. During the time that you were talking about any will, was there any discussion of any description of exact property which was to be included in that will? A. *On that point, I am very sure there was not.*

"Q. No discussion of either personal or real property which would be included in it? A. No discussion at that time.

"Q. Was there any discussion as to who would act as executor of any such will? A. No, we never got to that.

"Q. Was there any discussion as to who would act as witnesses on any such will? A. No, there was no discussion about it." (Emphasis supplied.)

■ It is true that if other competent evidence independent of the incompetent testimony is sufficient, when taken by itself, to support the findings, the error in admission of such incompetent evidence does not of itself constitute reversible error. White v. Smith, 43 Idaho 354, 253 P. 849.

However, the admission of such incompetent testimony as was admitted here is not a practice to be encouraged. The admission of such incompetent testimony places the

other party in a most disadvantageous and embarrassing position, and is not a precedent that should be followed. This is not a case where an inconsequential error was made in ruling on the admission of evidence.

In view of the fact that the court found that the testimony of Bovencamp and Huff, and the documentary evidence was sufficient to establish the agreement to make a will, the competent evidence should be viewed in the light most favorable to the respondents. According to the testimony of these witnesses, while the proposition was discussed, there were no definite and clear terms which the will should contain. Mr. Huff explained to the parties in his office that the making of a will would not accomplish the purpose sought, and after further discussion, deeds were prepared settling the controversy. While Mr. Bovencamp is himself not a party to the action, he was an interested witness, and his testimony is far from convincing, and it should be scrutinized with great care.

The testimony of Huff contradicts the theory that a will was to be made. After the deeds transferring the land in question were prepared, nothing further was said relative to a will. It was never again discussed or made an issue until after the death of Kristiane Johnson.

After the expiration of approximately seven years, and after the death of Kristiane Johnson, and when she could no longer speak, her estate was attempted to be impressed with a trust. The question presents itself, have the respondents established the right claimed by them by a quantum of proof as required by law?

■ Where an oral agreement of this nature rests on parol evidence, it must be established by clear, satisfactory and convincing evidence. Such a contract is to be looked upon with suspicion and can only be sustained when established by the clearest and strongest evidence, and such evidence must be so clear and forcible as to leave no reasonable doubt of its terms or character.

Mathews v. Tobias, 126 Or. 358, 268 P. 988; Scarlett v. People's Bank & Trust Co., 182 Wash. 257, 46 P.2d 1045; Reynolds v. Williams, 282 Pa. 148, 127 A. 473; Sharpe v. Wilson, 181 Iowa 753, 161 N.W. 35; Garren v. Shook, 306 Ill. 154, 137 N.E. 489; Kerr v. Kennedy, 105 S.C. 496, 90 S.E. 177; Walker v. Bohannan, 243 Mo. 119, 147 S.W. 1024.

■ In a similar case, Walker v. Bohannan, supra, the Supreme Court of Missouri held: "To warrant specific performance of an oral contract to convey, the contract must be clear and definite, must be proven as pleaded without being established by conversations too ancient, or too loose or casual, the contract must be fair, and must be based on an adequate consideration, the proof must leave no reasonable doubt that the contract was made, and that full performance so far as lies in the hands of the parties to perform has been had, but the

work constituting performance must be referable solely to the contract sought to be enforced; proof of mere disposition to devise or convey as a gift, or as a reward for services, being insufficient."

With this conclusion we agree.

It should also be noted that the deceased was an old lady, not fully conversant with the English language, was unrepresented by counsel at the purported times and places at which the alleged talks took place. Further, these talks, with some exceptions, and particularly the witness Bovencamp's testimony, refer more to conclusions and to impresssions than to what the deceased said.

 Impressions made on a witness or what he understood from a conversation are not competent to establish a contract to make a will.

The lapse of time between the alleged conversation and the death of the deceased, and the subsequent silence prior to her death, speaks forcibly against the contention of the respondents.

Eliminating the testimony of the beneficiaries of the alleged trust, the testimony of Bovencamp and Huff does not by itself show any consideration for the making of such a contract, or any detailed, definite terms of the contents of any proposed will.

Further, after the exchange of deeds was agreed to, the matters in dispute were apparently settled. The probate court distributed the property of the deceased, R. J. Johnson, in accordance with the terms contained in the exchange of deeds.

If we view the testimony of Bovencamp and Huff in the light most favorable to respondents, it cannot be reasonably deducted from such testimony that the deceased, Kristiane Johnson, ever contracted to make a will, or that there was any consideration for any such an agreement.

Due to the conclusions reached, other errors assigned need not be discussed.

It is therefore our conclusion that the deceased, Kristiane Johnson, died intestate, and that the judgment of the trial court should be reversed, the decree set aside and the trial court instructed to dismiss the action, and it is so ordered. Costs to appellants.

HOLDEN, C. J., and GIVENS, PORTER and TAYLOR, JJ., concur.